744 F.2d 270
 39 Fed.R.Serv.2d 636, 5 Employee Benefits Ca 1777
 Ted KATSAROS, John Kuebler, Robert Trott, Lawrence Kudla,
and Charles Curd, as participants in the Teamsters
Local 282 Pension Trust Fund,
Plaintiffs- Appellees,
v.
John CODY, Robert Sasso, John Dee, William Argento, Ralph
Guercia, Herbert Schneider and Louis Nappi, as
Trustees of the Teamsters Local 282
Pension Trust Fund,
Defendants-Appellants,
Anthony G. Angelos, C.J. Bassler, Jr., Jonathan T. Howe,
Clarence L. Jensen, Lambrose Karkazis, James C.
Kirie, James Kokonas, and James Verros,
Third Party-Defendants,
Local 282 International Brotherhood of Teamsters,
Chauffeurs, Warehouseman and Helpers of America,
Michael Carbone, Michael Bourgal, Joseph
Mattarazzo and Edward Silvera,
Intervenors.
Raymond J. DONOVAN, Secretary of United States Department of
Labor, Plaintiff- Appellee,
v.
John CODY, William Argento, John Dee, Ralph Guercia, Louis
G. Nappi, Robert Sasso, and Herbert Schneider, and
the Teamsters Local 282 Pension Trust
Fund, Defendants,
John Cody, William Argento, John Dee, Ralph Guercia, Louis
G. Nappi, Robert Sasso, and Herbert Schneider,
Defendants-Appellants,
John CODY, William Argento, John Dee, Ralph Guercia, Louis
G. Nappi, Robert Sasso, and Herbert Schneider,
Third Party Plaintiffs-Appellants,
v.
Anthony G. ANGELOS, C.J. Bassler, Jr., Jonathan T. Howe,
Clarence L. Jensen, Lambrose Karkazis, James C. Kirie, James
Kokonas, Anton A. Smigiel, James Verros and Herbert C.
Wenske, Third Party Defendants.
 No. 1065, Docket 83-6375.
 United States Court of Appeals,
Second Circuit.
 Argued May 3, 1984.
Decided June 29, 1984.
Certiorari Denied Dec. 3, 1984.
See 105 S.Ct. 565.
 
 Edward J. Boyle, New York City (Thomas R. Manisero, Wilson, Elser, Edelman & Dicker, New York City, of counsel), for defendants-appellants Cody, Sasso, Dee, Argento, Guercia, Schneider and Nappi.
 Arthur Z. Schwartz, New York City (Daniel E. Clifton, Susan M. Jennik, Joseph E. Gubbay, Hall, Clifton & Schwartz, New York City, of counsel), for plaintiffs-appellees Katsaros, Kuebler, Trott, Kudla, and Curd.
 Richard P. Carr, Atty., U.S. Dept. of Labor, Washington, D.C. (Francis X. Lilly, Sol. of Labor, Robert N. Eccles, Acting Associate Sol., Plan Benefits Sec. Div., Norman P. Goldberg, Counsel for Fiduciary Litigation, Plan Benefits Sec. Div., U.S. Dept. of Labor, Washington, D.C., of counsel), for Secretary of Labor.
 Alexander A. Miuccio, New York City (Robert F. Meehan, Altieri, Kushner & Miuccio, New York City, of counsel), for intervenor Ass'n of New York City Concrete Producers, Inc.
 J. Warren Mangan, Long Island City, N.Y. (O'Connor & Mangan, P.C., Long Island City, N.Y., of counsel), for intervenor Local 282 I.B.T.
 Robert M. Baptiste, and David J. Gzesh, Washington, D.C., for amicus curiae Intern. Broth. of Teamsters, Chauffeurs, Warehousemen and Helpers of America.
 Shea & Gould, New York City (Peter D. Stergios, Alice P. Henkin, New York City, of counsel), for amicus curiae The General Contractors Ass'n of N.Y., Inc.
 Before LUMBARD, MANSFIELD and KEARSE, Circuit Judges.
 MANSFIELD, Circuit Judge.
 
 
 1
 Appellant trustees[1] of the Teamsters Local 282 Pension Trust Fund, Welfare Trust Fund, Annuity Trust Fund, and Legal Services Trust Fund appeal from various judgments and orders[2] entered in the Eastern District of New York after a bench trial by Judge Jacob Mishler finding them jointly and severally liable for losses incurred by the Local 282 Pension Trust Fund ("Pension Fund") on account of breaches of their fiduciaries duties under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. Secs. 1001, et seq., and removing them from their positions as trustees of four funds in favor of a fund manager and an asset manager appointed by the court to serve until March 31, 1985.
 
 
 2
 This appeal arises out of two separate actions consolidated by the district court, one of which was filed by a group of participants in the Pension Fund ("the private plaintiffs") and the other by the United States Secretary of Labor ("the Secretary"). Both actions alleged that the appellant trustees violated their fiduciary duty under ERISA when they made a $2 million loan in 1979 to Des Plaines Bancorporation, Inc. ("Bancorporation"). The private plaintiffs' action also alleged that the trustees violated their fiduciary duty under ERISA when they failed to collect $23,474 plus interest from one Hyman Green in connection with an aborted loan to Green in 1978. Appellants, joined in part by two intervenors--the Association of the New York City Concrete Producers, Inc. and Local 282 of the International Brotherhood of Teamsters[3]--argue that the court below erred in the following respects:
 
 
 3
 (1) in finding that the trustees violated their fiduciary duty under ERISA with respect to the Bancorporation loan and the Hyman Green loan;
 
 
 4
 (2) in finding them jointly and severally liable for all losses incurred on account of those loans;
 
 
 5
 (3) in removing them as trustees of the four funds in favor of a court appointed asset manager and fund manager authorized to serve until March 31, 1985;
 
 
 6
 (4) in denying their request for a jury trial;
 
 
 7
 (5) in severing the third-party claims asserted by appellants against others;
 
 
 8
 (6) in bifurcating the trial into liability and damages phases; and
 
 
 9
 (7) in Judge Mishler's refusal to recuse himself.
 
 
 10
 We affirm the orders of the district court with the exception of the appointment of the fund manager to oversee the operation of the fund until March 31, 1985. We conclude that the fund manager should perform his duties only until the union and the employers' association have chosen successor trustees who are acceptable to the court.
 
 
 11
 In February 1978, at a time when the assets of the Pension Fund were approximately $58 million, the trustees of that fund approved a $35 million loan to Hyman Green, $20 million of which was to be used to purchase 10 acres of land and construct a hotel and gambling casino on the "Strip" in Las Vegas, Nevada, and $15 million of which was to be used to purchase certain property from the Pension Fund in Southampton, New York. As part of the loan agreement, Green expressly assumed responsibility for the Pension Fund's expenses in arranging the loan transaction. In April 1978, the United States Secretary of Labor commenced an action seeking to enjoin the Pension Fund and the trustees from making the loan to Green. In August 1978 Judge Mishler issued an order and judgment finding that the proposed loan violated the investment diversification and "prudent man" sections of ERISA, 29 U.S.C. Sec. 1104(a)(1)(B) and (C).[4] Marshall v. Teamsters Local 282 Pension Fund, 458 F.Supp. 986 (E.D.N.Y.1978). He enjoined the Pension Fund and the trustees from loaning the Fund's assets to Green and ordered the trustees to indemnify the Fund for any losses the Fund suffered as a result of the loan.
 
 
 12
 In November 1980 Green sued the Fund. The Fund counterclaimed for the $23,474 in expenses incurred by it in arranging the loan which had not been reimbursed by Green. Green's claim and the counterclaim are presently pending before Judge Mishler. The private plaintiffs then commenced this action in July 1981 seeking the $23,474 in unreimbursed expenses plus interest incurred in connection with the Green loan.
 
 
 13
 In the meantime, in January 1979, five months after Judge Mishler had enjoined the Fund's loan to Green, Anthony G. Angelos, president and chairman of the board of Bancorporation, informed John Cody, the Administrator of the Pension, Welfare, and Annuity Funds, that Bancorporation was seeking a loan by March 1, 1979, for its wholly owned subsidiary, the Des Plaines Bank ("the Bank"). On February 7, 1979, Jonathan T. Howe, a director and counsel to Bancorporation and counsel to the Bank, at Cody's suggestion wrote to Cody applying for a $2 million loan from the Fund to the Bank. Cody arranged for Howe to meet with the Fund's trustees at their February 27, 1979 meeting, which was the first time any of the trustees other than Cody learned of the proposed loan. At the meeting Howe distributed various financial statements of Bancorporation and the Bank: the consolidated financial statements of Bancorporation and the Bank as of December 31, 1978, the financial statement of the Bank as of December 31, 1978, and a comparative schedule of assets of the Bank as of December 31, 1977, November 30, 1978, and December 31, 1978. The three documents consisted of about 35 pages of figures and explanatory notes. Howe and Angelos made a two-hour presentation to the trustees and their certified public accountant, Harvey Colton, touching "on the highlights of the statement."
 
 
 14
 At trial Colton testified that neither he nor anyone on the Fund's staff had sufficient training to express an opinion as to the soundness of the loan. None of the trustees had an accounting or banking background. They were wholly unequipped personally to analyze the figures presented to them to find out whether any serious financial problems were faced by the prospective borrower. They lacked any expertise in such important matters as capital adequacy, quality of assets, liquidity, the value of the bank's stock, and the like. In short, they passively received a rosy superficial picture of the bank and its holding company from persons with an interest in obtaining their approval. No effort was made to obtain independent professional assistance or analysis of the financial data presented to them.
 
 
 15
 After some discussion the trustees voted to approve the $2 million loan to the Bancorporation subject to further review and negotiations in Chicago, the home of Bancorporation and of the Bank. The trustees appointed Cody and Ralph Guercia as a committee to examine the proposed security, to negotiate additional protective terms and, if matters proved satisfactory, to consummate the loan transaction. Cody and Guercia traveled to Chicago the next day, February 28, 1979, and continued discussions with Angelos and Howe. The two trustees visited the premises of the Bank and viewed the real estate that was to secure Angelos' personal guarantee of the loan. On the following day, March 1, 1979, Cody and Guercia signed various loan documents on behalf of the Pension Fund and $2 million was disbursed as a loan by the Fund to the Bank. At their next meeting, which was on March 20, 1979, the trustees, including Louis Nappi, who had been absent from the previous meeting, voted to approve and ratify the loan to the Bancorporation.
 
 
 16
 The agreement provided for a $2 million loan by the Fund to Bancorporation, to be repaid over a four-year period. Interest was to be payable at prime plus 1%, with a 10% floor on the interest rate. Bancorporation was to repay the loan in semi-annual installments of $125,000 plus interest. At the end of four years, a final balloon payment of $1.125 million was to be made. The security for the loan was 68,267 shares of capital stock of the Bank, representing 95% of its outstanding shares. If the book value of the stock should go below $2 million, the Bank or Bancorporation would be required to put up additional collateral. In addition to the stock, Angelos furnished as security for the loan his personal guarantee secured by a second mortgage on two parcels of property owned in part (58% and 64% respectively) by Angelos. The loan agreement also required Bancorporation to submit financial statements to the Pension Fund on a regular basis.
 
 
 17
 The Pension Fund received bi-annual payments from Bancorporation, as required by the loan agreement, in a timely fashion in September 1979, March 1980, and September 1980. On March 14, 1981, however, the Bank was closed by federal and state regulatory officials. At that time, the Bancorporation owed the Pension Fund a total of $1.625 million plus interest from September 1, 1980. Bancorporation has made no further payments of interest or principal to the Fund.
 
 
 18
 At trial the Secretary's expert, John Duffy, who had prepared a report on the subject of the financial advisability of making the loan, testified concerning the financial condition, performance, and credit-worthiness of the Bank (Bancorporation's sole asset) as of the time of the loan. Duffy concluded that there was ample information available to the trustees in February 1979 that pointed to the Bank's prospective failure. Neither the Bank nor Bancorporation had ever earned the amount of money needed to service the debt and there was nothing in the financial statements to suggest that they would be able to achieve such earnings in the future. The Bank's equity/asset ratio--3.46%--placed it 149th out of 151 Illinois banks in terms of that ratio, a fact which, according to Duffy, should have raised serious concerns "about how the loan would be repaid." Moreover, the tangible net worth of Bancorporation was only $500,000, after a $1 million "goodwill" entry on the balance sheet was subtracted. Duffy also observed that the abnormal rise in the amount of the Bank's loans (from $21 to $32 million between 1977 and 1978) should have prompted the trustees to "interrogate ... management" as to the kind of loans being made and their actual value versus their book value.
 
 
 19
 Other testimony revealed that similar red flags would have been uncovered if a reasonably careful inquiry had been made. First, six days before the trustees' February 27, 1979 meeting, officials of the Federal Deposit Insurance Corporation ("FDIC") had met with the Bank's board of directors, urging the latter to adopt a corrective plan to deal with the bank's undercapitalization, poor loan-to-deposit ratio, insufficient liquidity, high percentage of risky loans, and improper lending practices. Second, Bancorporation owed its principal creditor, Central National Bank in Chicago, approximately $1 million, due March 1, 1979. Inquiry by the Fund would have revealed that Central National, to which 50% of the amount loaned was to be paid immediately, had refused for the third time to extend the Bancorporation loan and had advised Des Plaines that if payment were not made in a timely fashion Central National would foreclose and take over the Bank. Moreover, at least five Chicago-area banks had refused to lend money to Bancorporation to refinance its debt to Central National Bank. Finally, the Fund's trustees failed to do more than have Cody and Guercia simply visit the property securing the Angelos guarantee. Further investigation would have revealed that on the day the loan agreement was signed (March 1, 1979) one of the two real estate parcels put up by Angelos as security for the loan was seized and sold for tax delinquencies. Moreover, both parcels turned out to be worth about a third of what Angelos had said they were worth.
 
 
 20
 The Fund's negligence with respect to the Bancorporation loan continued with the administration of the loan after it was disbursed. Although the Fund was entitled to regular financial statements from Bancorporation, it received only sporadic, incomplete financial information until the time of the bank's closing in March 1981. Even this information went largely unexamined. The trustees, Pension Fund staff, and the Fund's outside accountant never analyzed or reported upon the incomplete financial information that was furnished. The trustees also failed to exercise their right, set forth in the loan agreement, to demand additional, supplemental collateral equal to the $2 million loan amount. Finally, the trustees undercharged Bancorporation for interest amounts due on the loan for the period 1979 to 1980. Rather than apply the prime-plus-1% interest rate on a floating basis, as provided in the loan agreement, the trustees instead used the prime rate figure in effect 30 days before interest payments were due. As a result, the Fund received $32,500 less interest than it was entitled to during the course of the loan.
 
 
 21
 The actions filed by the private plaintiffs and the Secretary in July 1981 and July 1982, respectively, both alleged that appellants had breached their fiduciary duty as trustees to the Pension Fund in making the loan to Bancorporation. The private plaintiffs also challenged the appellants' behavior with respect to recovering the expenses incurred in making the Green loan. The trustees answered both complaints and requested a jury trial with respect to the Secretary's action but not with respect to the action brought by the private plaintiffs. In November 1982 the trustees filed a third-party action against Bancorporation's directors and counsel, alleging fraud in connection with the loan transaction. The trustees demanded a jury trial in this third-party fraud action. In December 1982 the district court consolidated the actions by the Secretary and private plaintiffs against the trustees for the purposes of discovery.
 
 
 22
 On April 5, 1983, the district court denied the appellants' request for a jury trial in the actions against them. Judge Mishler held that with respect to the private plaintiffs' action the request was not timely and that with respect to the Secretary's action the appellants were not entitled to a jury trial because the action sought only equitable relief. The court also severed the appellants' third-party actions from the main claims against appellants and consolidated the latter for purposes of trial.
 
 
 23
 A bench trial was held before Judge Mishler on April 27-29, 1983. On plaintiffs' motion at the outset of the trial Judge Mishler limited the trial to the issue of the trustees' liability. During trial he excluded certain testimony during trial on the ground that it related to the question of damages rather than liability.
 
 
 24
 On July 21, 1983, Judge Mishler issued his decision and order finding that the trustees violated their fiduciary duty in making the Bancorporation loan and in failing to collect the unreimbursed expenses in connection with the Green loan. The court held the trustees jointly and severally liable for all losses incurred on account of those breaches of fiduciary duty. Three months later, on December 7, 1983, after a hearing on relief, Judge Mishler held the trustees liable for $2.5 million in damages on account of the Bancorporation loan and $30,599 on account of the Green loan.[5] He also removed the six trustees from their positions managing the Pension Fund.[6] The court noted that Cody was particularly unfit to serve as trustee because of his personal history of breaches of fiduciary duty[7] and that the other trustees were also unfit to serve because of their breaches of fiduciary duty in connection with the Bancorporation and Green loans.[8] The court appointed in their place an asset manager to oversee the Pension Fund's investments, and a fund manager to oversee the Fund's day-to-day management. Both managers are to serve until March 31, 1985. On December 27, 1983, the court ordered that the trustees be removed from their positions with the Welfare, Annuity, and Legal Services Funds and that the asset and fund managers oversee those funds as well. Finally, on January 20, 1984, the court awarded $27,126 in attorneys' fees and $1,002 in costs to the private plaintiffs, and $9,416 in costs to the Secretary.
 
 DISCUSSION
 
 25
 The Severance of Appellants Third-Party Action, Denial of a Jury Trial of the Main Action, and Bifurcation of the Trial
 
 
 26
 Appellants argue that the district court erred in severing their third-party action, denying a jury trial of the consolidated actions against them, and bifurcating the trial into liability and damages phases. We disagree.
 
 
 27
 Fed.R.Civ.P. 42(b) vests the district court with broad discretion to sever a third-party claim for a separate trial. It provides that the district court may order a separate trial of a third party claim if such severance will be "in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy." In the present case the claims against the trustees were ready for trial whereas the third party claims were still early in discovery; indeed, not all of the third parties had been served, much less deposed or subjected to discovery requests. Thus, it was not an abuse of discretion for the court to sever those claims from the instant action. Moreover, there was no prejudice to the appellants on account of the severance. If they should prevail in their third-party claims, the amount of that recovery would be set off against any judgment entered against them by the district court.
 
 
 28
 The decision to bifurcate a trial into liability and damages phases likewise is "firmly within the discretion of the trial court under Fed.R.Civ.P. 42(b)." In re Master Key Antitrust Litigation, 528 F.2d 5, 14 (2d Cir.1975). Bifurcation of the trial in the present case was reasonable because the two phases involved different types of evidence. The evidence in the liability phase was concerned with the prudence of the bank loan at the time when the loan was made whereas the damages phase involved evidence as to the amount of money eventually lost on account of the loan. Thus there was no abuse of discretion in bifurcating the trial.
 
 
 29
 Nor were appellants entitled to a jury trial of the claims against them since the plaintiffs seek equitable relief in the form of removal and restitution as distinguished from damages for wrongdoing or non-payment of benefits. There is no right to a jury trial of ERISA actions against pension fund trustees seeking the equitable remedy of restitution. In re Vorpahl, 695 F.2d 318, 320-22 (8th Cir.1982); Calamia v. Spivey, 632 F.2d 1235, 1237 (5th Cir.1980); Wardle v. Central States, Southeast & Southwest Areas Pension Fund, 627 F.2d 820, 829-30 (7th Cir.1980), cert. denied, 449 U.S. 1112, 101 S.Ct. 922, 66 L.Ed.2d 841 (1981); Rubin v. Decision Concepts, Inc., 566 F.Supp. 1057 (S.D.N.Y.1983); Note, "The Right to Jury Trial in Enforcement Actions Under Section 502(a)(1)(B) of ERISA," 96 Harv.L.Rev. 737, 738 (1983).
 
 
 30
 Appellants rely on Pollock v. Castrovinci, 476 F.Supp. 606 (S.D.N.Y.1979), aff'd mem., 622 F.2d 575 (2d Cir.1980), as authority for the proposition that they are entitled to a jury trial. In that case a plan beneficiary brought an action to obtain a share of the surplus of a terminated pension trust, and her recovery required a judicial reformation of the plan as amended. The district court held that once it decided the equitable question of whether a provision in the pension plan should be excised, the remaining question of whether the plaintiff was entitled to additional monies was a legal question that should be decided by a jury. However, the legal or equitable nature of the latter question became moot, and there was no trial as to the amount plaintiff might recover, because the court determined that the plan should not be reformed. The order for a jury trial as to the amount of recovery could, of course, have been reconsidered by the district court at any time prior to the holding of such a trial; and, given what we view as the essentially equitable nature of Pollock's claim, we decline to follow the district court's mooted ruling that a jury trial was required. Accordingly, we hold that the district court correctly decided that appellants were not entitled to a jury trial.
 
 The $2 Million Loan to Bancorporation
 
 31
 Appellants urge that the court below erred in finding that they breached their fiduciary duty under ERISA in connection with the Bancorporation loan. We disagree.
 
 
 32
 ERISA requires a pension fund fiduciary to act "solely in the interest" of a plan's participants and beneficiaries, and to discharge his duties "with the care, skill, prudence, and diligence ... that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character...." 29 U.S.C. Sec. 1104(a)(1)(B). If a trustee fails to adhere to these fiduciary standards, he may be held personally liable under ERISA for whatever losses result to a plan from his misconduct. 29 U.S.C. Sec. 1109(a).
 
 
 33
 Prudence is measured according to the objective "prudent person" standard developed in the common law of trusts. Donovan v. Mazzola, 716 F.2d 1226, 1231 (9th Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 704, 79 L.Ed.2d 169 (1984); S.Rep. No. 127, 93d Cong., 2d Sess., reprinted in 1974 U.S.Code Cong. & Ad.News 4639, 4838, 4865 ("[t]he fiduciary responsibility section, in essence, codifies and makes applicable to these fiduciaries certain principles developed in the evolution of the law of trusts.") The court's task is to inquire "whether the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment." Donovan v. Mazzola, 716 F.2d 1226, 1232 (9th Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 704, 79 L.Ed.2d 169 (1984). Donovan v. Cunningham, 716 F.2d 1455, 1467 (5th Cir.1983) ("courts have focused the inquiry under the 'prudent man' rule on a review of the fiduciary's independent investigation of the merits of a particular investment"). A trustee's lack of familiarity with investments is no excuse: under an objective standard trustees are to be judged "according to the standards of others 'acting in a like capacity and familiar with such matters.' " Marshall v. Glass/Metal Association, 507 F.Supp. 378, 384 (D.Haw.1980).
 
 
 34
 The court below found that the trustees acted in violation of the foregoing standard, and that they therefore are liable for the losses incurred by the Fund on the Bancorporation loan. That finding cannot be labelled clearly erroneous. On the contrary, evaluating the Bancorporation loan from the perspective of the "time of the investment decision" rather than from "the vantage point of hindsight," American Communications Association v. Retirement Plan, 488 F.Supp. 479, 483 (S.D.N.Y.), aff'd, 646 F.2d 559 (2d Cir.1980), the finding was clearly correct. The trustees, being ill-equipped to evaluate the soundness of the proposed loan, failed to observe their duty to seek outside assistance. They relied exclusively on the representations of Bancorporation, the borrower, as to its financial strength and reached an investment decision after wholly inadequate inquiry and deliberation. A reasonable investigation would have revealed evidence that the loan was totally unsound. Although the expert called by the Secretary, John Duffy, had not, as appellants note, had experience in pension fund management, the issue here is much more specialized, namely whether a loan to a bank or bank holding company was a prudent investment. Duffy was fully qualified by training and experience to testify on that basic issue and brought his expertise to bear through his analyses based on generally accepted ratios such as profitability, adequacy of capital, and liquidity, and through his evaluation of the asset quality of the borrower and its guarantor. These inquiries revealed that the loan was a loser from its inception. The district court properly relied on Duffy's testimony and its decision that the trustees acted imprudently in violation of ERISA must be affirmed.
 
 
 35
 The Unrecovered Expenses and Interest Incurred on Account of the Green Loan
 
 
 36
 Appellants argue that the district court erred in finding that they breached their fiduciary duty under ERISA in failing to recover over $23,000 plus interest in expenses incurred in connection with the Green loan. They challenge that finding on three grounds: (1) that the private plaintiffs, prior to the filing of this action, failed to make a demand on the trustees to seek recovery of the expenses; (2) that the private plaintiffs' claim is barred by the statute of limitations; and (3) that they have taken proper steps to recover the money from Green by counter-claiming against him for the expenses. We disagree.
 
 
 37
 With respect to the first claim, although common law may have required a prior demand before bringing an action, Congress did not incorporate that doctrine into the ERISA statute. The ERISA jurisdictional statute, 29 U.S.C. Sec. 1132(a)(3), contains no such condition precedent to filing suit. The claim must therefore be rejected.
 
 
 38
 Nor is the present action barred by the statute of limitations. The statute provides that a suit challenging a trustee's conduct must be filed within either six years of the date of the last action which constituted part of the breach of fiduciary duty or three years after the earliest date on which the plaintiff had actual knowledge of the breach, whichever is earlier. 29 U.S.C. Sec. 1113.[9] Appellants argue that the private plaintiffs knew about the Green loan in February 1978, three and a half years before they filed this action in July 1981. However, the crucial commencement date for statute of limitations purposes is not the earliest date on which the plaintiffs could have learned that the trustees had approved the Green loan, but the earliest date on which they learned that the trustees would not recover all of the costs incurred in negotiating the loan. Indeed, the parties stipulated that "the first time that Plaintiffs became aware that the Fund had expended money which was not repaid by Mr. Green was after the counterclaim was filed in the Green case." That counterclaim was filed in March 1981. The private plaintiffs' action, based on the trustees' failure to recover the costs incurred in connection with that loan, was filed a mere four months later. The district court therefore correctly ruled that the private plaintiffs' suit was timely filed.
 
 
 39
 Finally, appellants argue that because they have taken steps to recover the expenses incurred in making the Green loan by filing a counterclaim against Green, which is presently pending before Judge Mishler, they should be excused from liability for those expenses. However, the possibility that they may recover from Green in the pending suit does not excuse them from liability as fiduciaries for losses incurred because of their own imprudent actions. If they should later recover the $30,474 in their action against Green, the district court will then credit them for that recovery in its order mandating that they compensate the Fund for losses caused by them.
 
 The Relief Granted by the District Court
 
 40
 Appellants argue that the district court erred (1) in not reducing the $2.5 million judgment against them by the amount of monies received by the Fund from the sale of collateral and (2) in assessing prejudgment interest against them at the "prime-plus-one-percent" rate specified in the Bancorporation loan until March 1983, the loan's maturity date, and at the prime rate of 11% thereafter.
 
 
 41
 The first contention is answered by the district court's express provision that "[p]ayments received by the Fund on account of the loan will be credited against the judgment sum." As for the second, it is well-settled that ERISA grants the court wide discretion in fashioning equitable relief to protect the rights of pension fund beneficiaries including the award of prejudgment interest. Donovan v. Bryans, 566 F.Supp. 1258, 1264-65 (E.D.Pa.1983); Gilliam v. Edwards, 492 F.Supp. 1255, 1266-67 (N.J.1980). This includes the power to award interest at a rate that will put the [Pension Fund] in the position that it would have occupied but for the [trustees'] breach." Freund v. Marshall & Ilsley Bank, 485 F.Supp. 629, 644 n. 7 (W.D.Wis.1979); Gilliam v. Edwards, 492 F.Supp. 1255, 1266-67 (N.J.1980). Expert testimony revealed that at the time of the Bancorporation loan "several hundred" other banking institutions were in the market to borrow at a rate of prime plus one percent. Awarding prejudgment interest in accord with prevailing interest rates is consistent with prior case law. Donovan v. Mazzola, 716 F.2d 1226, 1232-33 (9th Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 704, 79 L.Ed.2d 169 (1984); Freund v. Marshall & Ilsley Bank, 485 F.Supp. 629 (W.D.Wis.1979). Thus, the district court did not abuse its discretion.
 
 
 42
 Appellants, joined by the two intervenors, also challenge the district court's removal of the trustees in favor of a court-appointed asset manager and a fund manager as an abuse of the court's discretion to fashion equitable remedies. However, ERISA provides that:
 
 
 43
 "Any person who is a fiduciary with respect to [a covered employee benefit] plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter ... shall be subject to such other equitable or remedial relief as the court may deem appropriate." 29 U.S.C. Sec. 1109(a).
 
 
 44
 The accompanying legislative history expressly contemplated that such "other equitable or remedial relief" would include removal:
 
 
 45
 "It is expected that a fiduciary ... may be removed for repeated or substantial violations of his responsibilities and that upon removal the court may, in its discretion, appoint someone to serve until a fiduciary is properly chosen in accordance with the plan." S.Rep. No. 383, 93d Cong., 2d Sess., reprinted in 1974 U.S.Code Cong. & Ad.News 4890, 4989.
 
 
 46
 As we have held, removal of pension fund trustees and the appointment of a person to serve in their stead is appropriate under the statute when they have engaged in "repeated or substantial violation[s] of [their] responsibilities." Marshall v. Snyder, 572 F.2d 894, 901 (2d Cir.1978). Since the trustees here acted imprudently with respect to the Green loan and the Bancorporation loan, it was not an abuse of discretion for the court to remove the trustees pursuant to its equitable power.[10] The appointment of the asset and fund managers was therefore permissible and appropriate.
 
 
 47
 Judge Mishler's decision to appoint asset and fund managers also does not in our view violate the Labor Management Relations Act ("LMRA"). It is true that under Sec. 302(c)(5) of the LMRA, 29 U.S.C. Sec. 186(c), employees and employers of a pension fund must be represented in the administration of the fund and this provision has been interpreted by the Supreme Court to require an equal balance in the representation. NLRB v. Amax Coal Company, 453 U.S. 322, 330, 101 S.Ct. 2789, 2794, 69 L.Ed.2d 672 (1981). However, although the union has appointed its successor trustees and the employer association is prepared to do likewise, we are satisfied that these provisions of the LMRA are subject to the broad equitable powers granted by ERISA to remedy breaches of trust on the part of the representatives by appointment of managers for a reasonable length of time. Otherwise the union and employers could thwart the objectives of ERISA by reappointing the same derelict representatives to continue the violations of their fiduciary duties.
 
 
 48
 A more difficult question is whether the 15-month term during which the asset manager and fund manager were appointed to serve exceeds the authority of the district court under ERISA. The statute does not expressly deal with the matter. However, the legislative history of ERISA states that upon removal of fiduciaries "the court may, in its discretion, appoint someone to serve until a new fiduciary is properly chosen in accord with the plan." S.Rep. No. 383, 93d Cong., 2d Sess., reprinted in 1974 U.S.Code Cong. & Ad.News 4890, 4989. Congress' intent thus appears to have been that the court should not unduly prolong the duration in office of a receiver or other officer appointed by it but make an effort to turn over control to trustees elected as permitted under ERISA provided they appear to the court to meet appropriate standards of integrity and competence. Although in Marshall v. Snyder, 572 F.2d 894, 896 (2d Cir.1978), we approved the appointment of a receiver by the district court until new trustees could be installed, we have not ruled on the issue of whether a receiver or other officer may be appointed to serve beyond the date when newly elected trustees are installed. In the present case the risk of further harm to the beneficiaries, in light of the past trustees' derelictions, lies in the area of investment management, presently conducted by the court-appointed asset manager, rather than in the day-to-day operation of the fund, including supervision of disbursements and receipts, which is presently carried out by the fund manager. The latter operation involves little discretion and there is no claim that the trustees, once the imprudent investment decisions were made, improperly accounted for pension fund receipts or disbursements. Accordingly, we approve the district court's appointment of the asset or investment manager until March 31, 1985, as a legitimate and appropriate exercise of its equitable power. With respect to the appointment of the fund manager, however, we remand to the district court for further consideration in light of the foregoing, with instructions to terminate the appointment of the fund manager as soon as successor trustees are appointed by the union and employer association who meet with the court's approval, even if that occurs prior to March 31, 1985. See Donovan v. Mazzola, 716 F.2d 1226, 1237 (9th Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 722, 79 L.Ed.2d 169 (1984)(appointment of investment manager to oversee pension fund for 10 years approved on condition that non-investment functions would be performed by trustees).
 
 
 49
 The intervenor Local 282 argues that the asset manager chosen by the district court, Albert Lewis, is not a registered investment adviser under the Investment Advisers Act of 1940 as required by the ERISA statute[11] and that therefore he is not qualified to serve as an asset manager. The intervenor, however, has misconstrued the statute, which provides that an employee benefit plan may provide for the appointment of an "investment manager" to manage the assets of the plan, 29 U.S.C. Sec. 1102(c)(3), in which event the trustees will not be liable for the acts or omissions of such investment manager. 29 U.S.C. Sec. 1105(d). In order to shield the trustees from liability in this fashion, the investment manager must meet the requirement set forth in 29 U.S.C. Sec. 1002(38), including the requirement that the investment manager be a registered investment manager under the Investment Advisers Act of 1940. However, the statute does not require that asset managers appointed by the district court satisfy these criteria. On the contrary, the district court possesses greater latitude in appointing asset managers. The intervenor has not alleged that the chosen asset manager is any way ill-equipped to serve in that capacity. We defer to the discretion of the court below in making that appointment.
 
 
 50
 We have considered the other grounds for reversal urged by appellants and find them to be without merit. Judge Mishler was not obligated to recuse himself simply because he presided at the criminal trial of Cody arising out of Cody's activities as a trustee of the Pension Fund. Recusal under 28 U.S.C. Sec. 455(b) for bias or prejudice based on personal knowledge of disputed evidentiary facts is required if that "[i]nformation or knowledge possessed by a judge ... stem[s] from an extrajudicial source." United States v. Coven, 662 F.2d 162, 168 (2d Cir.1981), cert. denied, 456 U.S. 916, 102 S.Ct. 1771, 72 L.Ed.2d 176 (1982). "Knowledge acquired by a judge while he performs judicial duties does not constitute grounds for disqualification." Id. Here the information forming the basis of the bias claim came to Judge Mishler's attention in his performance of his duties in the prior judicial proceeding.
 
 
 51
 Accordingly, we affirm the judgment of the district court in all respects with the exception of the appointment of the fund manager and remand with directions to terminate that appointment upon the parties' designation of trustees in accordance with the plan who are found by the district court to meet the foregoing requirements.
 
 
 
 [1]
 The trustees are John Cody, Robert Sasso, John Dee, William Argento, Ralph Guercia, Herbert Schneider, and Louis Nappi
 
 
 [2]
 The orders and judgments appealed from are:
 (1) April 5, 1983 order striking appellants' demand for a jury trial, severing the appellants' third party actions from the main claims, and consolidating the main claims;
 (2) April 22, 1983 order denying appellants' application for reargument of the denial of a jury trial and severance of the third party actions and appellants' motion for Judge Mishler's recusal;
 (3) July 21, 1983 order finding the appellants liable for breaches of fiduciary duties on account of the Hyman Green loan and the Bancorporation loan;
 (4) December 7, 1983 order and judgment mandating that the trustees reimburse the Pension Fund for losses incurred on account of the two loans and providing for the appointment of a fund manager and an asset manager to manage the Pension Fund until March 31, 1985; and
 (5) December 27, 1983 order which joined the Welfare, Annuity, and Legal Services Funds as defendants in both actions, enjoined the trustees from acting as fiduciaries of those funds and extended the appointments of the asset and fund managers to include those funds.
 
 
 [3]
 The intervenor Association of New York City Concrete Producers challenges only the appointment of the receiver to serve until March 31, 1985, and the intervenor Local 282 challenges the removal of the trustees from their positions as well as the duration of the receiver's appointment
 
 
 [4]
 The statute provides in relevant part:
 "(a)(1) ... a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and--
 * * *
 "(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
 "(C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; ..."
 
 
 [5]
 The court below determined the loss as follows:
 Unpaid balance .............................. $1,625,000
Interest erroneously computed ................... 32,500
Interest as provided in the loan agreement
from 9/1/80 to 3/1/83 .......................... 700,453
Interest from 3/1/83 to 12/15/83 at
 governing prime rate of 11% .................. 141,512
 ----------
 SUB TOTAL ....................... $2,499,465
Due Fund on failure to reimburse it for
 fees paid on the Green loan ................... 23,473
Interest on the $23,473 at 9% .................... 7,126
 ----------
 SUB TOTAL ....................... $ 30,599
 GRAND TOTAL ..................... $2,530,064
 ----------
 
 
 [6]
 The trustees are composed of three appointed by the union and three appointed by the employers' association
 
 
 [7]
 Cody had been previously found guilty of violating the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. Sec. 1961(5), in connection with his duties as a trustee and administrator of the Pension Fund. That conviction was affirmed by this court. United States v. Cody, 722 F.2d 1052 (2d Cir.1983)
 
 
 [8]
 Trustee Ralph Guercia was not serving at the time of the Hyman Green loan and hence he was removed as trustee solely on the basis of his participation in the Bancorporation loan
 
 
 [9]
 The statute provides in full:
 "(a) No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of--
 (1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission, the latest date on which the fiduciary could have cured the breach or violation, or
 (2) three years after the earliest date (A) on which the plaintiff had actual knowledge of the breach or violation, or (B) on which a report from which he could reasonably be expected to have obtained knowledge of such breach or violation was filed with the Secretary under this subchapter;
 except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation."
 
 
 [10]
 Although trustee Guercia acted imprudently only with respect to the Bancorporation loan, his removal as trustee is justified on the basis that it would be infeasible to allow him to maintain his position while removing the other trustees in favor of a court-appointed asset manager and fund manager
 
 
 [11]
 Title 29 U.S.C. Sec. 1002(38). This definitional section provides in full:
 "(38) The term 'investment manager' means any fiduciary (other than a trustee or named fiduciary, as defined in section 1102(a)(2) of this title)--
 (A) who has the power to manage, acquire, or dispose of any asset of a plan;
 (B) who is (i) registered as an investment adviser under the Investment Advisers Act of 1940; (ii) is a bank, as defined in that Act; or (iii) is an insurance company qualified to perform services described in subparagraph (A) under the laws of more than one State; and
 (C) has acknowledged in writing that he is a fiduciary with respect to the plan."