829 F.2d 1120
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Clarke RUSS, Plaintiff-Appellant,
v.
VIRGINIA BEACH ORTHOPEDIC ASSOCIATES, INC., a Virginia
corporation; Virginia Beach Orthopedic Associates, Inc.,
Profit-Sharing Plan and Trust; Virginia Beach Orthopedic
Associates, Inc.; Money Purchase Pension Plan and Trust;
Robert W. Waddell, Plan Trustee, Virginia Beach Orthopedic
Inc. Money Purchase Pension Plan and Trust; Robert W.
Waddell, Plan Trustee, Virginia Beach Orthopedic Associates
Inc. Profit Sharing Plan and Trust; Marlene J. Jones, Plan
Administrator, Virginia Beach Orthopedic Associates, Inc.
Money Purchase Pension Plan and Trust; Marlene J. Jones,
Plan Administrator, Virginia Beach Orthopedic Associates,
Inc. Profit-Sharing Plan and Trust; Virginia Beach
Orthopedic Associates, Inc., Plan Administrator, Virginia
Beach Orthopedic Associates, Inc. Money Purchase Pension
Plan and Trust, Defendant-Appellee.
 No. 87-1512.
 United States Court of Appeals, Fourth Circuit.
 Argued May 7, 1987.
Decided Sept. 22, 1987.
 
 Appeal from the United States District Court for the Eastern District of Virginia, at Norfolk. Richard B. Kellam, Senior District Judge. (CA-85-852-N)
 James Carroll Howell (James R. Warner, Jr.: Willcox & Savage, P.C., on brief), for appellant.
 Montgomery Knight, Jr. (Cyrus A. Dolph, IV; Michael F. Bergan; Harlan, Knight, Dudley & Pincus, on brief), for appellees.
 Before DONALD RUSSELL and WILKINSON, Circuit Judges, and BUTZNER, Senior Circuit Judge.
 BUTZNER, Senior Circuit Judge:
 
 
 1
 Dr. Clarke Russ appeals the judgment of the district court dismissing his complaint against Virginia Beach Orthopedic Associates, Inc. (VBOA), its Profit-Sharing and Pension Plans, and their trustee and administrator. Dr. Russ charged that VBOA and the trustee, Dr. Robert Waddell, imprudently sold real property of the Plans at less than fair market value and sold one parcel to a party in interest in violation of The Employee Retirement Income Security Act of 1974 (ERISA), Secs. 404(a)(1)(A) and (B) and 406(a), 29 U.S.C. Secs. 1104(a)(1)(A) and (B) and 1106(a). He assigns error to the district court's findings that a four acre tract was sold at fair market value and that it was not sold to a party in interest. Because we conclude that the district court's valuation of the property is supported by the record, we affirm its judgment.
 
 
 2
 * Virginia Beach Orthopedic Associates is a professional corporation of orthopedic physicians located in Virginia Beach, Virginia. VBOA maintains a Profit-Sharing Plan and a Pension Plan, both established pursuant to the provisions of ERISA. Dr. Waddell has been associated with VBOA for 21 years and has been trustee of the Plans since 1975.
 
 
 3
 VBOA employed Dr. Russ from January 1, 1971, until July 1, 1982. He participated in the Plans and became 100% vested in his account balances. The district court determined that Dr. Russ's shares were $463,995.59 in the Profit Sharing Plan and $87,590.54 in the Pension Plan. The principal in each plan and accrued interest and earnings were paid to Dr. Russ in early 1987.
 
 
 4
 The primary issue is whether the district court erred in finding that Dr. Waddell sold the property at fair market value. In 1975, Dr. Waddell, as 'trustee for the Profit Sharing plan, purchased approximately 15 acres on Old Donation Parkway in Virginia Beach, Virginia, for $98,400. Dr. Waddell sold part of this tract in 1978 for $198,000, leaving the four acres which are the subject of this appeal. As early as 1976, VBOA had considered buying this land from the Plan to build medical offices. The Plan also placed the land on the market. After two unsuccessful attempts to get the land rezoned from residential to commercial use, VBOA succeeded in 1983 in having the property rezoned but with restrictions that limited its use to medical offices and required extensive off-site improvements. These included water, sewer, curbs, gutters, turn lanes, and stop lights. The rezoning permit also specified construction of onsite berms and a buffer.
 
 
 5
 In mid or late 1983, VBOA's attorney advised them that VBOA could not legally buy the property directly. The VBOA principals therefore set up a partnership, Old Donation Medical Associates (ODMA), formed October 1, 1983, to purchase the property. ODMA comprised the same stockholders, directors, and physicians as VBOA. However, counsel advised that sale to ODMA would also violate ERISA and that an independent buyer would have to be found. Bruce Holbrook, a partner in the firm that provided accounting services to VBOA and the Plans, together with an independent private investor, acquired CFC Corporation for this purpose. On December 22, 1983, on behalf of CFC, Holbrook offered to purchase the property for either $300,000 cash or $335,000 on a deferred basis, contingent on execution of a leaseback to ODMA. On December 23, 1983, Dr. Waddell, as trustee of the Plans, agreed to accept $300,000 cash for the property. The sale was closed December 29, 1983. Simultaneously CFC leased the property to ODMA at a monthly rental identical to the mortgage payments plus a $1,000 annual fee. At the same time, VBOA guaranteed an industrial development bond in the amount of $1,565,000 for the offices. Also, CFC and its stockholders agreed to sell, and ODMA agreed to buy, all the CFC stock within 13 months. The district court accepted testimony that this agreement was . intended only to protect CFC during construction. The court found that it was not presently enforceable because the risk of CFC's liability arising from construction had passed with the expiration of the period of 13 months.
 
 
 6
 After rezoning, the city of Virginia Beach assessed the property at 100% in the amount of $353,916. Dr. Waddell got two appraisals of the property. The first appraiser valued the property at $417,000, without taking into account site costs. The second appraiser valued the land at $440,000. He then deducted $90,000 for estimated off-site development costs, reducing the valuation to $350,000. Site engineers and a general contractor supported the estimation of the costs of development. A former real estate investment trust officer testified that the second appraisal was thorough. In view of the restrictive zoning, the absence of a real estate commission, and the value of a cash offer over deferred payments, he concluded that the trustee acted prudently in accepting an offer of $300,000 cash.
 
 
 7
 Dr. Russ's expert appraised the property at $525,000, but he had no information about off-site development costs and was not aware of the specific zoning limitations. Apparently he did not conduct as thorough a survey as did the second appraiser whom Dr. Waddell had used.
 
 
 8
 In making the offer of $300,000 cash or $350,000 deferred over 20 years, Holbrook had available the appraisal of $350,000. He deducted 15% for the likelihood of cost overruns for off-site development and 10% because no real estate commission had been involved.*
 
 
 9
 Evidence of value conflicted. The district court resolved this conflict by taking into account the restrictive zoning of the property, the requirement for off-site development, and the expertise of the appraiser who made the $350,000 appraisal. The court also considered the testimony of a former trust officer who offered the opinion that the Plan's trustee acted prudently in accepting the $300,000 cash offer. Applying the familiar principles of Federal Rule of Civil Procedure 52(a), we cannot say that the district court's valuation was clearly erroneous. See Anderson v. City of Bessemer, 475 U.S. 564 (1985). Consequently, we affirm the district court's judgment that the sale of the four acre tract did not harm either Dr. Russ or the Plans.
 
 II
 
 10
 In addition to holding that Dr. Russ suffered no damage as a result of the sale of the property, the district court found that that transaction did not violate ERISA. We find it unnecessary to decide this issue. In the absence of any damages, the legality of the sale need not be examined unless a finding of illegality could lead to a grant of injunctive relief.
 
 
 11
 Dr. Russ left VBOA about four years before he commenced this action. He has withdrawn all sums credited to his accounts in both Plans. The Plans owe him nothing. He no longer has a professional or a financial interest in the Plans or in VBOA. As a result, his requests for remedies such as rescission of the sale and removal of the trustee run aground on the "basic doctrine of equity jurisprudence that courts of equity should not act ... when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief." Younger v. Harris, 401 U.S. 37, 43-44 (1971).
 
 
 12
 Dr. Russ correctly notes that courts have on occasion used their equitable powers to protect the participants in ERISA plans, see, e.q., Katsaros v. Cody, 744 F.2d 270, 281 (2d Cir.1984); Eaves v. Penn, 587 F.2d 453, 463 (10th Cir.1978). In those cases, unlike the situation here, the plans suffered harm from imprudent transactions by the trustees. The finding that the four acre parcel was sold at fair market value means that there is no injury to the Plans to be remedied, much less any injury lacking adequate remedy at law. Nor has Dr. Russ offered evidence that Dr. Waddell in his capacity as trustee has refused or delayed the court-ordered settlement of accounts between Dr. Russ and the Plans. The future conduct of the trustee can offer no threat of injury to Dr. Russ, who now has no further interest in the gains or losses of the Plans.
 
 
 13
 Dr. Russ suggests that rescission of a transaction, and removal of the trustee, should follow a finding of illegality as a matter of course, even without the showing of necessity normally required to justify use of equitable powers.
 
 
 14
 The text of ERISA contains no requirement for automatic rescission or removal of a trustee, and none was intended. it was Congress's purpose in passing ERISA to "protect ... the interests of participants in employee benefit plans and their beneficiaries," ERISA 6 2(b), 29 U.S.C. Sec. 1001(b), and both the per se rule against transfers to interested parties and the remedies authorized by Sec. 409, 29 U.S.C. Sec. 1109, were adopted as means towards that end, not as ends in themselves. Section 409 leaves discretion with the courts to apply only such remedies as they "may deem appropriate," and there is no doubt that this discretion is to be exercised for the benefit of the Plan participants and beneficiaries.
 
 
 15
 Significantly, neither the Secretary of Labor nor present participants in the Plans have joined Dr. Russ's effort to oust Dr. Waddell who, according to the record, has greatly increased the value of the funds through prudent real estate investments over the years. It would clearly be inappropriate, and quite possibly injurious to the participants, to remove Dr. Waddell at the sole behest of one who is, or should be, completely disinterested in the future administration of the Plans.
 
 
 16
 The judgment of the district court is affirmed.
 
 
 
 *
 The contingency factor for overruns turned out to be conservative. At the time of trial $83,600 had been expended and the estimates of additional costs brought the total to $119,000