**In re BICOASTAL CORPORATION d/b/a Simuflite, f/k/a The Singer Company, Debtor.**

**Bankruptcy No. 89–8191–8P1.**

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

May 4, 1994.

Harley Riedel and David Potter, special counsel for debtor.

Russell S. Bogue, III, for applicant.

William Goldman, for Unsecured Creditors Committee and Bicoastal Corp.

### ORDER ON OBJECTION
### TO ADMINISTRATIVE
### CLAIM OF LORAL

ALEXANDER L. PASKAY, Chief Judge.

THIS is a confirmed Chapter 11 reorganization case, and the matter under consideration is an Application for Administrative

Expense, filed by the Committee for the Librascope Retirement Plan (Loral) and the Objection to its Claim filed by the Debtor. In its Claim, Loral contends it is entitled to an allowance as cost of administration in the approximate amount of $3.7 million which represents the loss allegedly suffered by the Singer Master Trust (Master Trust) resulting from the Debtor's alleged post-petition breach of its fiduciary duty as Master Trust sponsor arising from an allegedly improvident investment. In opposition, the Debtor contends that it did not violate its duty as the Master Plan sponsor and it did conduct due diligence in connection with this investment, and that the Master Trust was not damaged by this investment. In due course this matter was set for final evidentiary hearing, and the facts relevant to resolution of this controversy, as established at that hearing, are as follows:

During the time relevant, the Debtor was the sponsor of its retirement plan, known as the Singer Master Trust (Master Trust). Under the Master Trust, the Debtor was authorized to appoint the Named Fiduciary for Asset Management. David Redmond (Redmond) who served as the Debtor's President and Chief Executive Officer, was also appointed to act as the Named Fiduciary for Asset Management for the Master Trust. Under the Master Trust, the Debtor was charged with the ultimate responsibility for supervising all investments of Pension Plan assets. The Northern Trust Company (Northern Trust) was named as Trustee for the Master Trust.

In early 1990, Redmond was approached by Fred Bullard (Bullard), a local businessman and land developer. Redmond met Bullard before and Bullard suggested to Redmond a possible investment by the Trust in real estate. Bullard initially attempted to suggest this investment to Paul Bilzerian (Bilzerian), who prior to 1990 was CEO of the Debtor and also acted as the Named Fiduciary of the Master Trust who directed Bullard to contact Redmond to discuss the proposal of Bullard.

Initially, Bullard suggested that the Trust purchase a tract of land located in Osceola County, Florida, which was involved in a foreclosure at the time. The land in questions is adjacent to land owned by the Walt Disney Company, close to Disney World. Redmond rejected the concept, stating that the Master Trust was not interested to invest and own real property. Therefore, Redmond agreed to loan the funds of the Master Trust to Bullard, solely on a short-term basis, in order to enable Bullard to purchase the property at foreclosure. It was understood that Bullard would find replacement financing and repay the funds advanced by the Trust in full.

The closing of the loan was scheduled shortly after Bullard's first meeting with Redmond and the time available to Redmond to conduct due diligence was limited. When Redmond submitted the proposed transaction to Northern Trust, it was rejected because of the haste in processing this loan and because of the shortness of time it was not possible to properly investigate the proposed loan. Under the terms of the Trust Agreement, for approval of any investment of trust funds, Northern Trust's consent was required. However, the Master Trust permitted the creation of a special Separate Investment Trust for the purpose of managing a special asset of the Master Trust, for which the Trustee was unwilling or unable to act for any reason. (Loral's Exh. 1). This Special Trust was to be created by a written instrument, and an Investment Trustee was to be designated to take custody and manage the asset, the corpus of the Special Investment Trust. Redmond did establish a Special Trust, for the purpose of managing the Bullard loan, which was its sole asset, and Redmond named himself to act as the Investment Trustee of this Special Trust. Redmond authorized and directed Northern Trust to transfer the funds. Northern Trust complied with the request and transferred the funds necessary to consummate the proposed transaction with Bullard.

The Bullard loan was closed on March 30, 1990, and the Master Trust loaned $3,167,000.00 to an entity created by Bullard known as Gateway Prospect, Inc. (Gateway), the named borrower and the purchaser of the Osceola property. The initial promissory note had a one-year maturity date, and car-

ried a high interest rate of 24% in order to encourage Gateway to seek refinancing. The Note was secured by a first mortgage on the property and was personally guaranteed by Bullard.

Prior to closing Bullard was requested and did furnish his personal financial statement. It is without dispute that this financial statement was unaudited and was prepared by Bullard himself and Redmond was aware that the financial statement was unaudited and prepared by Bullard. Redmond did not undertake any independent investigation into Bullard's financial strength and his ability to respond to his guarantee in the event Gateway defaulted on the loan.

In connection with this transaction, Redmond employed the law firm of Glenn, Rasmussen & Fogarty (Law Firm) to assist him in connection with the required due diligence. The attorney of the Law Firm undertook an independent investigation of this proposed investment by the Trust. Part of that investigation was a review of appraisals supplied by Bullard, discussions with engineers about the feasibility of the planned use for the land, and an environmental audit to ascertain any potential environmental liabilities or obstacles. It is without dispute that no new appraisal was ordered by Redmond, nor was the appraisal provided by Bullard investigated.

In September, 1990, Gateway failed to make an interest payment of $380,000.00. It is without dispute that Redmond did not demand Bullard respond on his guarantee and cure the default. Instead, Redmond agreed to rewrite the Note extending the term of the Note by rolling all past due interest payments into the principal to be paid at the new maturity of the Note. Redmond did not request any additional security as consideration for rewriting the Note. It is without dispute that neither Redmond nor any one else from the Trust monitored Gateway's attempts to develop this land. On March 30, 1991, the renewed Note fully matured, and when the Note was called Gateway was unable to satisfy its obligation under the Note.

In 1992, Northern Trust filed suit to foreclose its mortgage securing the Note. The foreclosure was uncontested by Gateway and on September 24, 1992, a Stipulated Final Judgment of Foreclosure was entered in favor of Northern Trust. The Final Judgment was entered in favor of Northern Trust in a total amount of $5,151,556.81 including costs and pre-judgment interest through September 17, 1992, and the property was purchased by Northern Trust on behalf of the Master Trust at the foreclosure sale.

Based upon these facts, Loral contends that this Special Trust was created by Redmond in order to circumvent Northern Trust's rejection of the Bullard investment and second that Redmond breached the fiduciary duty of the Debtor owed to the Master Trust and imposed by the Employee Retirement Income Security Act of 1974 (ERISA) 29 U.S.C. § 1001, et seq., and therefore, the Debtor is liable for the damages incurred by the Trust as a result of the Gateway investment. The claim for administrative expense filed by Loral is in a total amount of $4,561,298.69. This amount includes costs, interest and attorney's fees not awarded in the foreclosure judgment, as well as a credit of $1,450,000.00 for the fair market value of the property at the time of the foreclosure which was purchased at the foreclosure sale by Northern Trust on behalf of the Master Trust and is still owned by the Master Trust. In support of the objections under consideration, the Debtor contends first that the due diligence conduct by Redmond was sufficient and the investment was proper and the Debtor did not breach its fiduciary duty owed to the Master Trust. Lastly, and possibly most importantly, the Debtor contends that since the Master Trust is substantially overfunded, the Master Trust suffered no losses and, therefore, is not entitled to damages.

The Master Trust Agreement obligates all individuals and entities owing a fiduciary duty to the Plan to carry out that responsibility prudently, and for the exclusive benefit of the Plan's beneficiaries, and in accordance with the terms and conditions of ERISA. (Loral's Exh. 1). ERISA § 404(a)(1) sets forth the standards of fiduciary conduct, which provides, in pertinent part, that a fiduciary must discharge his or

her duties "solely in the interest of the participants and beneficiaries" and:

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims

(D) in accordance with the document and instrument governing the plan.

29 U.S.C. § 1104(a)(1). These obligations are referred to as "The Prudence Requirement" and the "Exclusive Benefit Requirement."

■■■ The Prudence Requirement and the Exclusive Benefit Requirement are the key protections afforded by ERISA. *Donovan v. Cunningham*, 716 F.2d 1455 (5th Cir. 1983), *cert. denied*, 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984). The Prudence Requirement requires a fiduciary making a pension plan investment decision to give "appropriate consideration" to those facts and circumstances that, given the scope of the investment duties, the fiduciary should know are relevant to the particular investment or courses of action involved, and to act accordingly. 29 U.S.C. § 1104(a)(1)(B). ERISA does not excuse a fiduciary's breach of duty because the fiduciary acted in good faith. *Martin v. Walton*, 773 F.Supp. 1524 (S.D.Fla.1991). In addition, ERISA principles hold fiduciaries to a more exacting standard than common law of trusts standards. *Donovan v. Mazzola*, 716 F.2d 1226 (9th Cir.1983); *Martin v. Walton*, *supra*. § 404(a)(1)(B) explicitly holds fiduciaries to the standard of a prudent expert, rather than that of a prudent layman. In situations where pension plan fiduciaries are making loans, the fiduciary is held to the standard of professional bankers and bank investment advisers. *Katsaros v. Cody*, 744 F.2d 270 (2d Cir.) *cert. denied*, 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984). The fiduciary's conduct must be evaluated as of the time of the investment, without considering the ultimate success or failure of the investment. *Donovan, supra.*

■■■ In evaluating the loan by the pension plan, the Court may consider several factors in determining the prudence of the fiduciary's decision, including:

(1) Whether the fiduciary sought the advice of independent counsel in making the decision;

(2) The interest rate of the loan compared to other assets in the fund's portfolio;

(3) The ability of the borrower to repay the loan;

(4) The value of the collateral pledged to secure the loan;

(5) The fiduciary's evaluation of the value of the collateral;

(6) Whether a guaranty of the loan was executed;

(7) The financial ability of the guarantor to pay the borrower's obligations in the event of a default.

*Donovan v. Walton*, 609 F.Supp. 1221 (S.D.Fla.1985); *Brock v. Walton*, 794 F.2d 586 (11th Cir.1986); *Katsaros, supra; Donovan v. Mazzola, supra.*

In evaluating this loan according to these factors, it is clear that Redmond did in fact obtain the advice of independent counsel in employing the Law Firm to assist in due diligence. In addition, it is clear that the interest rate of the loan was appropriate in view of the circumstances surrounding the transaction. Finally, this Court is satisfied that the collateral pledged was sufficient to secure the loan, based upon the location of the property and the physical attributes of the property as set forth by the testimony at trial. However, this Court is equally satisfied that the fiduciary breached his duty of prudence by accepting an unaudited financial statement from Bullard, without so much as a question as to the information contained in the financial statement. It is clear that no investigation was done into the ability of Bullard to pay Gateway's obligation in the event of default. In this Court's judgment, Redmond's familiarity with Bullard personally and as a real estate developer is not an adequate substitute for an appropriate inves-

tigation into the guarantor's ability to satisfy the loan in the event of default. Based upon the foregoing, this Court is satisfied that Redmond did breach his duty of prudence.

■ This leaves for consideration the amount of damages to be awarded to Loral. The damages asserted by Loral are comprised of two components: losses associated with the default on the loan, and attorney's fees, expenses and interest.

In considering the value of the property, this Court has considered the testimony of the appraisers, together with their written reports, and finds that the value assigned to the property by the Debtor's appraiser is more accurate. The appraiser for Loral provided comparables which were not truly comparable to the subject property, including properties which did not have utilities accessible, and which were not located on paved roads, both attributes of the subject property. Therefore, this Court accepts the value of $3.4 million for the subject property.

In addition, it should be noted that Loral still owns the property and therefore, has not suffered any actual loss as a result of this investment. Instead the loss asserted by Loral is in actuality speculative. In fact, in view of the location of the property contiguous with Disney property, and the expected development of the Disney properties in the future, it is not inconceivable that this property will increase in value in the near future. Furthermore, Loral incurs little overhead cost in holding the property, the only cost being property taxes. The fact that the Trust may have made money had the investment been made prudently is also speculative. The Trust can be compensated only for actual loss, which, this Court is satisfied was not suffered by Loral.

■ This leaves for consideration the remainder of the claim, the bulk of which is made up of attorney's fees. Loral, in its claim, seeks in excess of $35,000.00 in attorney's fees for the foreclosure of the subject property. It is uncontroverted in this record that the foreclosure was uncontested. It is also clear that the attorneys who were hired to handle the foreclosure were located in distant cities, the closes being Miami, to han-

dle a foreclosure in Orlando. Finally, this Court is satisfied that $35,000.00 is an unreasonable amount of fees for a simple uncontested foreclosure action which was resolved by a stipulated final judgment. Therefore, this Court is satisfied that an appropriate amount of fees for an uncontested foreclosure is $1,000.00, and Loral is awarded this amount.

■ In addition, Loral seeks an additional $123,924.17 for fees and costs incurred in this litigation and for other services. Upon review of the invoices supporting this portion of the claim, this Court is not able to distinguish the specific tasks undertaken by each of the firms, or to establish a designation of what time was spent by what firm in representing Loral in a variety of tasks. Not only are fees for this litigation sought for compensation in this claim, in addition, general representation in the case, as well as in other proceedings outside of this Court, and general advice were rendered on to Loral by these law firms. Without a breakdown, it is impossible for this Court to test the reasonableness of these fees in the context of what services were rendered. Therefore, this portion of the claim shall be disallowed without prejudice to allow Loral to file an amended claim setting out in detail exactly what services were rendered on behalf of Loral, and to designate in what separate actions or matters the services were rendered.

■ Finally, Loral seeks $7,914.75 for 1993 real estate taxes for the subject property. The record is clear that Loral has held this property for more than a year, and during that time has made no efforts to market or sell the property. Stretching this request for compensation to its logical extreme, Loral could hold the property forever, and hold the Debtor responsible for the property taxes. This Court is satisfied that Loral has not sustained its burden to show that the 1993 real estate taxes are attributable to actual losses of the plan associated with this investment. Therefore, this Court is satisfied that this portion of the claim should be disallowed.

Accordingly, it is

ORDERED, ADJUDGED AND DE-CREED that the Objection to Administrative Claim of Librascope Retirement Plan is hereby sustained, and the claim is hereby allowed in the reduced amount of $1,000.00, without prejudice to allow Loral to file an amended claim setting forth the detail and designation of the attorney's fees incurred in this case, exclusive of the fees and expenses incurred in the foreclosure action.