GARY L. EYLER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Eyler v. Commissioner
Docket No. 16247-92
United States Tax Court
T.C. Memo 1995-123; 1995 Tax Ct. Memo LEXIS 119; 69 T.C.M. (CCH) 2200; March 23, 1995, Filed *119 Decision will be entered for respondent with regard to the deficiencies. For petitioner: Don A. Tabbert, James C. McKinley, and Thomas A. Brodnik
For respondent: Nancy B. Herbert. RUWE
RUWE
MEMORANDUM FINDINGS OF FACT AND OPINION RUWE, Judge: Respondent determined deficiencies in petitioner's excise taxes imposed on prohibited transactions by section 4975 [1] and additions to tax [2] as follows: First Tier
Second Tier
Additions to Tax Year
Deficiency
Deficiency
Sec. 6651 (a)(1) and (2)
1986
$ 500,000
--
$ 245,000
1987
500,000
--
215,000
1988
500,000
--
185,000
1989
500,000
--
155,000
1990
500,000
$ 10,000,000
125,000
After concessions, the sole issue for decision is whether the sale *120 by petitioner of Continental Training Services, Inc. (CTS), stock to the CTS employee stock ownership plan was for adequate consideration. We hold that it was not. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, first supplemental stipulation of facts, and attached exhibits are incorporated herein by this reference. [3] Petitioner resided in Indianapolis, Indiana, when he filed his petition. Historical Summary of CTS
CTS was incorporated and began operations in 1973. CTS's primary business was operating vocational schools to train truck drivers and heavy equipment operators. Since its inception, petitioner was either the sole or majority shareholder of CTS as well as both the chief executive officer and the chairman of the board of directors of CTS. For the fiscal years *121 ending June 30, 1984 through 1987, CTS used the cash basis of accounting for income tax purposes and the accrual basis of accounting for financial statement purposes, resulting in certain timing differences. Relevant financial data from the financial statements of CTS for the fiscal years 1983 through 1987 are as follows: Fiscal Year Ending June 30 (in millions, except
earnings per share) 1983
1984
1985
1986
1987
Assets
$ 13.2
$ 10.4 $ 30.0
$ 40.9 $ 57.0 Tuition income
9.6
19.6 36.9
52.3 63.1 (sales) Retained earnings
1.6
(.5)  2.7
5.9 10.5 Net cash flow
2.0 4.6
(.7) (6.0) Net income
0.0
2.1 3.2
4.6 3.2 Earnings per share
.00
.40 .63
.92 .63 Unaudited comparative interim financial data for the first quarter of fiscal years 1986 and 1987 (periods ending September 30, 1985 and 1986) are as follows: 3-Month Period Ending September 30
(in millions, except earnings per share) 1985 1986 Assets
[1]-- $ 46.55
Tuition income
10.94
13.92
(sales) Retained earnings
[1]-- 6.51
Net income
.86
.98
Earnings per share
.17
.20
The Initial *122 Public Offering
In 1985, petitioner began exploring the possibilities of either selling CTS or taking the company public. CTS began receiving inquiries and solicitations from a number of investment banking firms regarding taking CTS public, merging CTS, or selling CTS. CTS provided these firms with information about the company, and, in response, the firms provided CTS with an opinion as to an estimated range of value for CTS. These estimates ranged from $ 50 million to $ 120 million. The CTS board of directors and senior management team knew of these estimates and discussed them. Sometime in the latter part of November 1985, petitioner received an offer from Waste Management Systems to purchase his CTS stock. Petitioner rejected this offer as inadequate after discussing it with Merrill Lynch, Mr. Bernard Perry (a financial consultant for CTS who later became the chief financial officer and a director of CTS), and Mr. Gregory Hahn (an attorney with the law firm that represented CTS who later became general counsel and an officer and director of CTS). In early 1986, petitioner and CTS decided to take the company public through an initial public offering (IPO). Prudential-Bache *123 Securities (Pru-Bache) and Raffensperger, Hughes & Co. (Raffensperger) were retained by CTS as underwriters in connection with the CTS IPO. Other than being retained for the proposed IPO, Pru-Bache had no connection to CTS or petitioner. Mr. L. Gene Tanner, the chairman of Raffensperger's board of directors, and the president and chief executive officer of Raffensperger since 1975, was also a director of CTS during 1986. Beginning in the spring and continuing into the fall of 1986, Pru-Bache and Raffensperger conducted a due diligence investigation into CTS for the purpose of taking the company public. The due diligence investigation consisted of reviewing the financial records and history of CTS, visiting the company's facilities, interviewing the management, and evaluating financial and economic forecasts. As a result of the due diligence investigation, an estimated price range was established within which the stock of CTS might possibly be offered to the public in the IPO. This estimated price range was not binding. The underwriter was free to market the stock outside the price range. The stock would not be sold pursuant to the proposed IPO until a final price was established. *124 The final price could have fallen outside the estimated range. Immediately prior to August 1986, CTS had two shareholders: petitioner, the majority shareholder, and Mr. John Strakis. On August 1, 1986, CTS underwent a restructuring of its stock ownership. Under this restructuring, CTS executed a promissory note in exchange for Mr. Strakis' shares. Under the terms of the note, CTS promised to pay Mr. Strakis an amount equal to 33,875 times the estimated IPO price of $ 14.25 within 5 business days after the opening date of the IPO. In the event that the IPO price was more or less than the estimated $ 14.25, the parties agreed to adjust the note accordingly. The shares previously owned by Mr. Strakis were canceled with the understanding that Mr. Strakis would receive 33,875 shares in the event that the proposed IPO did not materialize by December 31, 1986. [4]
*125 Also, pursuant to the stock restructuring, CTS purchased all petitioner's stock (with the exception of 1 share) for a nominal price. CTS then declared a 4,999,950-to-1 stock split. There were 4,999,950 CTS shares issued and outstanding, all of which were owned by petitioner as of August 1, 1986. On September 10, 1986, a preliminary prospectus was filed on behalf of CTS with the Securities and Exchange Commission. In the preliminary prospectus, the estimated range of offering price for CTS stock, as determined by the underwriters, was between $ 13 and $ 16 per share. The proposed public offering provided for 2,200,000 shares to be sold to the public -- 1,450,000 of which were to be offered by petitioner and 750,000 of which were to be offered by CTS. Thus, at the end of the public offering, the total outstanding shares of CTS would be increased by 750,000 to 5,749,950. In preparing the preliminary prospectus, the most recent financial information available to Pru-Bache was for the fiscal year ending June 30, 1986. After setting the proposed offering price range, the underwriters attempted to determine whether there was any interest in purchasing CTS stock in that price range. *126 Petitioner and the underwriters attempted to market the proposed IPO to potential purchasers during October and up until the first week of November 1986. The "circle of interest" for CTS stock at the $ 13 to $ 16 price range was determined by Pru-Bache and Raffensperger to be about $ 1 million or less. The market for IPO's is sensitive and cyclical; timing is critical. Investment bankers refer to the fluctuations in the IPO market as the "Wall Street window". When the window is open, the opportunity is ripe for an IPO; when the window is closed, the IPO market is weak. Swings in the IPO market relate to activity in the overall market or in a particular industry. At the time of the contemplated CTS IPO, the market in general was declining, thereby causing the Wall Street window to close. As a result, Pru-Bache and Raffensperger eventually advised CTS to postpone the IPO and wait to see if the IPO market would improve. CTS postponed the IPO, but planned to revive it when the market improved. While there was some discussion of decreasing the public offering price of CTS shares to $ 12 per share, CTS and petitioner felt that $ 12 per share was too low and decided against it. *127 Formation of the CTS ESOP
CTS formed an employee stock ownership plan (ESOP) effective December 12, 1986. The CTS board of directors named Mr. John J. Bruno, vice president of human resources for CTS, as the plan trustee. The board also appointed a plan committee as follows: Petitioner, Gregory F. Hahn (also a CTS director), Michael J. Vance, Daniel F. Evans, Jr., and George E. McGinnis. Under the terms of the ESOP plan, CTS was designated the plan administrator and a named fiduciary. CTS's duties under the plan included appointing and overseeing the plan committee. The ESOP included a provision, referred to in the plan as a "put option", granting each employee a right to sell CTS stock to the company or the ESOP trustee at its fair market value upon distribution of such stock to the employee. The plan further provided that the sale price upon exercise of the option could be paid in annual installments, bearing a reasonable rate of interest, over a maximum of 5 years. The CTS ESOP purchased 689,655 shares of CTS stock (approximately 13.7 percent of CTS's outstanding shares) from petitioner on or about December 22, 1986, for $ 14.50 per share, or $ 9,999,997.50. To fund *128 the purchase of the CTS shares, the CTS ESOP borrowed $ 9,999,997.50 from American Fletcher National Bank (the Bank). On or about November 24, 1986, CTS had approached the Bank to negotiate a $ 10 million loan to be secured by the shares to be sold to the ESOP by petitioner. Mr. Perry handled the negotiations for the ESOP loan with the Bank on CTS's behalf. Prior to approving the loan to the CTS ESOP, the Bank performed a due diligence investigation of CTS. The Bank also required two opinion letters. The Bank relied upon an opinion letter from the law firm of Manatt, Phelps, Rothenberg, Tunney & Phillips (Manatt, Phelps) as an indication that the proposed loan and ESOP transaction did not violate or constitute a nonexempt prohibited transaction under either the Internal Revenue Code or the Employee Retirement Income Security Act of 1974 (ERISA), Pub. L. 93-406, 88 Stat. 829 (current version at 29 U.S.C. secs. 1001-1461 (Supp. 1990)). [5] The Bank relied upon an opinion letter from the law firm of Cohen Malad & Hahn to show that CTS had the corporate power to enter into the loan transaction. *129 During the meeting of the CTS board of directors on December 12, 1986, Mr. Perry explained the current financial statements of CTS and compared them to the company's financial projections. The board members had an opportunity to discuss the information presented by Mr. Perry and to ask questions concerning specific items. Later in the meeting, the CTS board considered and approved the establishment of the ESOP under the terms proposed by Mr. Perry during the meeting. These terms provided: (1) The ESOP would borrow $ 10 million from the Bank, with the loan to be guaranteed by CTS; (2) the loan proceeds would be used by the ESOP to purchase 689,655 shares of CTS stock from petitioner; and (3) the purchase price of the stock would be $ 14.50 per share. [6] Petitioner did not participate in the CTS board's discussions or voting concerning the ESOP transaction. The board approved *130 the terms of the loan from the Bank and voted for CTS to guarantee the loan. The board also authorized one of the directors to finalize the loan. The loan agreement between the CTS ESOP and the Bank and the term note were executed on December 22, 1986, under the same terms as negotiated by Mr. Perry and approved by the board. The loan was guaranteed by CTS and by petitioner in his individual capacity. As additional security for the loan, petitioner was required to pledge $ 5 million. This was accomplished by having the Bank retain $ 5 million from the proceeds of the ESOP loan. The board relied heavily on Mr. Perry's statement that $ 14.50 per share was a fair price for the CTS stock. The minutes from the December 12, 1986, board meeting state: Mr. Perry discussed the ramifications by the Internal Revenue Service and the challenge to the valuation placed on the stock by Prudential-Bache which could come up under certain contexts. Mr. Perry indicated that he thought the valuation placed on the company by Prudential-Bache was very reasonable and if it were he[,] he would not sell his stock for anything less. Different members of the Board asked questions concerning the *131 valuation and what the employees might be able to expect for their stock if it were to be sold in the future. Mr. Perry indicated it is impossible to predict what the price of stock would be in the future, but he again reiterated that he felt that the market price of $ 14.50 being paid was fair and equitable to both sides.
Mr. Perry had a good reputation as a businessman in the areas of public finance and business valuations. Mr. Perry was deceased at the time of trial. Effect of ESOP on CTS
Under an agreement with the Bank, CTS was obligated to make contributions to the ESOP in an amount sufficient to cover the loan payments. The loan principal was payable at a rate of $ 2 million per year, in quarterly installments of $ 500,000. For the period from December 22, 1986, to June 30, 1987, CTS charged $ 1,116,552 to expense as a result of the ESOP. Generally Accepted Accounting Principles required CTS to classify the ESOP's loan as a direct debt of the company and a charge to shareholders equity. As contributions were made to the ESOP by the company, reducing the ESOP's debt, equivalent amounts would be restored to the shareholders equity account. CTS was subject to *132 certain restrictive covenants as a result of the loan agreement with the Bank. For example, CTS would be limited in its ability to borrow money or to grant liens. Capital expenditures would also be limited, and a dividend moratorium would probably be imposed. CTS might also have been able to realize certain benefits from the ESOP. Possible intangible benefits included: Improved recruiting, securing good personnel, and benefits from employee ownership of the company. Future payroll increases were also expected to be reduced as a result of the ESOP, and CTS would be able to take tax deductions for the contributions made to the ESOP. Stock Purchases by CTS Directors
Sometime in late December 1986 or early 1987, several of the CTS board members each purchased 1,882 shares of CTS stock from Mr. Strakis, the minority shareholder of CTS, for $ 14.50 per share. The directors borrowed the purchase price of the stock. Because the directors could not immediately obtain loans from the Bank, petitioner made bridge loans to the directors. These bridge loans were unsecured and were evidenced by no formal loan documents. The stock certificates evidencing the directors' purchases were *133 prepared in March 1987, when their loans from the Bank were formally approved. The Bank required these certificates for collateral. Other Events Affecting CTS
In April 1986, the Government changed the method by which guaranteed student loans were to be disbursed by lenders. [7] As a result, there was a delay in the receipt of student loan funds by CTS, thus negatively affecting cash-flow. To cover any shortfalls in cash, CTS established a $ 3 million unsecured line of credit with the Bank. The cash flow lag was expected to cause a permanent reduction in available cash of approximately $ 5 million. This change and its effect on CTS were discussed in the preliminary prospectus for CTS's proposed IPO. On July 26, 1985, the California Department of Motor Vehicles (DMV) filed an accusation against CTS alleging that certain vehicles used by CTS at its California training center were not maintained properly and that CTS *134 engaged in certain fraudulent practices and untrue or misleading advertising with respect to its courses. The accusation sought relief in the form of suspension or revocation of CTS's license. In March 1986, the DMV agreed to hold its administrative proceedings and settlement discussions in abeyance until completion of an investigation by the attorney general of California. On July 22, 1986, the attorney general of California advised CTS of his tentative conclusions: (1) The tuition refund policy of CTS was unfair and not in compliance with California law; (2) CTS's combination home study/resident training course did not meet the minimum course length criteria for participation in certain Federal student financial aid programs; and (3) information disseminated by CTS on the placement statistics and salaries of the company's graduates was false and deceptive. As of the September 1986 filing of the preliminary prospectus for the proposed IPO, the investigation by the attorney general of California had not been concluded. Rather, the attorney general indicated that he intended to file a civil suit against CTS seeking injunctive relief, restitution, and civil penalties for violations *135 of the California Unfair Practices Act. By the December 12, 1986, board meeting, representatives from CTS had met with the California DMV and believed that the DMV would settle for $ 75,000 reimbursement of expenses and a 2-year probation or "period of review". In early 1986, the U.S. Department of Education commenced an audit and investigation of CTS, presumably focusing on the same or similar areas as the California attorney general's investigation. As of the filing of the preliminary prospectus in September 1986, this investigation, too, had not been concluded. Both of the above investigations were disclosed in the preliminary prospectus. With regard to these investigations, the preliminary prospectus noted: "If any of these proceedings is concluded on an adverse basis to the Company, the Company could be severely and adversely affected." In 1988, the U.S. Department of Justice, on behalf of the U.S. Department of Education, filed a $ 366 million lawsuit against CTS. The Government also withdrew CTS's eligibility to participate in various Government student loan programs. The effect of this withdrawal was to eliminate CTS's primary source of income. This withdrawal was *136 later judicially determined to be a violation of CTS's constitutional right to due process, but by that time, CTS had been financially destroyed. In late January 1987, CTS first considered acquiring an interest in Overland Express (Overland), a public trucking company. On or about February 23, 1987, CTS purchased approximately 28 percent of the outstanding stock of Overland from Mr. W. F. Hagerman for approximately $ 3,250,000. This purchase proved to be a poor investment, ultimately costing CTS millions of dollars. In March 1987, CTS obtained a $ 3 million unsecured line of credit from the Bank to provide working capital loans to Overland. Then, in connection with a debt restructuring of Overland, CTS purchased approximately $ 1,900,000 worth of mortgage loans from a former Overland creditor. As of July 1987, CTS had lent Overland approximately $ 3 million. During 1987, CTS retained Duff & Phelps, Inc., as an independent investment and financial analyst to determine the fair market value of the CTS stock held by the ESOP. Prior to this engagement, Duff & Phelps, Inc., had provided professional services in connection with financing arrangements between CTS and Overland. In *137 a letter dated December 14, 1987, Duff & Phelps, Inc., determined that, as of June 30, 1987, the fair market value of CTS stock was $ 10.50 per share. This valuation reflected CTS's investment in Overland. This valuation also reflected the $ 9 million debt owed by the ESOP as an obligation of CTS. In 1989, CTS filed for bankruptcy and was eventually liquidated. OPINION Section 4975(a) and (b) imposes a two-tier excise tax on prohibited transactions between an ESOP and disqualified persons. Section 4975(a) imposes a yearly 5-percent tax on the amount involved. [8] *138 Section 4975(b) imposes a second tier of tax equal to 100 percent of the amount involved where the prohibited transaction is not corrected within the taxable period. [9]A prohibited transaction includes any direct or indirect sale or exchange of property between a plan and a disqualified person. Sec. 4975(c)(1)(A). A disqualified person includes an owner, direct or indirect, of 50 percent or more of the stock of a corporation whose employees are covered by the plan. Sec. 4975(e)(2)(E), (C). Respondent determined that petitioner was a disqualified person and that he engaged in a nonexempt prohibited transaction within the meaning of section 4975 and, therefore, was liable for the excise tax. It is undisputed that petitioner was a disqualified person and that the sale of stock by petitioner to the ESOP constituted a prohibited transaction under section 4975(c). However, section 4975(d) provides that certain types of transactions shall not constitute prohibited transactions for purposes of the excise tax. Of relevance to the instant case is section 4975(d)(13), which exempts "any transaction which is exempt from section 406 of * * * [ERISA] by reason of section 408(e) of * * * [ERISA]". Petitioner bears the burden of proving that he falls within the exception provided in section 4975(d)(13). Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); see also Donovan v. Cunningham, 716 F.2d 1455, 1467-1468 n.27 (5th Cir. 1983). *139 ERISA section 406 provides that a fiduciary with respect to a plan shall not engage in certain prohibited transactions, including a sale or exchange of property between the plan and a party in interest. [10]29 U.S.C. sec. 1106(a)(1)(A). However, exceptions are made for certain transactions, which are listed in ERISA section 408. Of relevance to this case is ERISA section 408(e)(1), which excepts the sale of employer securities for adequate consideration. [11]29 U.S.C. sec. 1108(e)(1). "Adequate consideration" is defined as "the fair market value of the asset as determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan and in accordance with regulations promulgated by the Secretary [of Labor]" 29 U.S.C. sec. 1002(18)(B). *140 As of the date of the ESOP transaction in issue, no such regulations had been promulgated.[12] However, it has been held that ESOP fiduciaries will carry the burden of proving that adequate consideration was paid "by showing that they arrived at their determination of fair market value by way of a prudent investigation in the circumstances then prevailing." Donovan v. Cunningham, supra at 1467-1468. Thus, the adequate consideration test focuses on the conduct of the fiduciaries in determining the price, not the price itself. It establishes an objective standard of conduct -- "a pure heart and an empty head are not enough." Id. at 1467. Respondent has stipulated that if the fair market value of the CTS stock sold to the ESOP is determined to have been at least $ 14.50 per share, then petitioner will not be liable for the excise taxes imposed by section 4975. Thus, petitioner will prevail if he can prove either (1) that the fair market value of the CTS stock sold to the ESOP was at least $ 14.50 per share, or (2) that the $ 14.50 price was determined in good faith by way of a prudent investigation. *141 A. Fair Market Value of CTS Stock
Fair market value is traditionally defined as "'the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts.'" United States v. Cartwright, 411 U.S. 546, 551 (1973) (quoting sec. 20.2031-1(b), Estate Tax Regs.). The standard is objective, using a purely hypothetical willing buyer and seller. Propstra v. United States, 680 F.2d 1248, 1251-1252 (9th Cir. 1982); Estate of Newhouse v. Commissioner, 94 T.C. 193, 218 (1990); Estate of Mueller v. Commissioner, T.C. Memo. 1992-284. The determination of fair market value is a question of fact. Hamm v. Commissioner, 325 F.2d 934, 938 (8th Cir. 1963), affg. T.C. Memo. 1961-347; Estate of Newhouse v. Commissioner, supra at 217. In general, property is valued as of the valuation date on the basis of market conditions and facts available on that *142 date -- without regard to hindsight. Subsequent events are considered only to the extent that they were reasonably foreseeable at the date of valuation. Estate of Gilford v. Commissioner, 88 T.C. 38, 52 (1987). Furthermore, in determining the value of unlisted stocks, actual sales made in reasonable amounts at arm's length, in the normal course of business, within a reasonable time before or after the valuation date, are the best criteria of market value. Duncan Indus., Inc. v. Commissioner, 73 T.C. 266, 276 (1979); Estate of Neff v. Commissioner, T.C. Memo. 1989-278; Hooker Indus., Inc. v. Commissioner, T.C. Memo. 1982-357. Pru-Bache Valuation
Petitioner argues that the $ 14.50 price is supported by an independent valuation by Pru-Bache as well as by Mr. Perry's opinion that the stock was worth $ 14.50. While Pru-Bache certainly conducted a due diligence investigation and established an estimated price range at which it thought CTS stock might sell in the public market, it did not purport to determine the fair market value of CTS as of a specific *143 point in time. In addition, the Pru-Bache estimated offering price range was based on certain underlying assumptions, which were not present at the time of the ESOP transaction. The underlying assumptions included: (1) A public marketplace for the stock, (2) a successful IPO, resulting in a capital infusion to CTS, [13] *144 and (3) the absence of an ESOP with its attendant debt and minimum contribution requirements. [14] Furthermore, the price range established for the proposed IPO was not binding and did not represent a firm commitment by the underwriter. Thus, the Pru-Bache estimated price range, for purposes of the preliminary prospectus, does not purport to indicate the fair market value of the CTS stock for purposes of the ESOP transaction. While it is true that Mr. Perry told the board of directors that he thought that the $ 14.50 price was fair, this does not, in itself, prove the fair market value of the CTS stock. Although Mr. Perry had a favorable reputation in the business community, he was not qualified as an expert for purposes of this trial, and there was no evidence as to what specific factors Mr. Perry considered in arriving at the $ 14.50 price. We are not required to accept such a statement at face value, and we decline the invitation to do so. Expert Testimony
Petitioner also argues that the testimony *145 of Mr. R. James Alerding, petitioner's expert witness, supports the $ 14.50 price. While expert opinions can assist the Court in evaluating a claim, we are not bound by the opinion of any expert witness and may reach a decision based on our own analysis of all the evidence in the record. Helvering v. National Grocery Co., 304 U.S. 282, 295 (1938); Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285; Estate of Newhouse v. Commissioner, 94 T.C. at 217. Mr. Alerding, a C.P.A. and a certified valuation analyst, prepared his report in October 1993. He opined that $ 14.50 per share was the fair market value of CTS stock at the time of the ESOP transaction. Mr. Alerding based his opinion largely on his belief that the Pru-Bache estimated price range for purposes of the proposed IPO, which was determined by comparing CTS to similar, publicly traded companies, was a current and reliable valuation. Mr. Alerding also relied on Mr. Perry's statement during the December 12, 1986, board meeting that a fair value of CTS's stock was $ 14.50 *146 per share. Mr. Alerding regarded Mr. Perry as an expert in the business valuation area. We find the report and testimony of petitioner's expert witness unpersuasive. Mr. Alerding made no independent appraisal. He relied on documents prepared by others many years earlier, such as the preliminary prospectus, Pru-Bache's estimated price range, and appraisals prepared by Corporate Appraisals, Inc., and Duff & Phelps, Inc., in his analysis; however, he did not independently determine the viability of the content of these documents. Indeed, we have already found that Pru-Bache's estimated price range for the proposed IPO could not be relied upon to fix the fair market value of the CTS stock when it was sold to the ESOP. Although Mr. Alerding independently determined that the "guideline companies" method was the appropriate method of valuation to use, he made no analysis of the comparable companies used by Pru-Bache in its estimation of a price range. Furthermore, he did not review basic information necessary for an appraisal, such as loan agreements, real estate and equipment values, tax returns, student loan regulations, key man life insurance coverage, and capital requirements. *147 Director Purchases
Petitioner points to purchases of CTS stock by several directors for $ 14.50 per share shortly after the ESOP transaction to establish fair market value. Petitioner relies heavily on our decision in Capital City Excavating Co. v. Commissioner, T.C. Memo. 1984-193, in which we held that certain director purchases of the company's stock were sufficiently at arm's length to establish the fair market value of the stock. We find this reliance misplaced. In order for an actual sale to qualify as a benchmark for the fair market value of stock, the actual amount sold should be reasonably comparable. Duncan Indus., Inc. v. Commissioner, 73 T.C. at 276; Hooker Indus., Inc. v. Commissioner, T.C. Memo. 1982-357. In the present case, the size of the CTS director purchases was nominal in relation to the ESOP transaction. Each director purchased 1,882 shares of CTS stock, which, in the aggregate, amounted to 13,174 -- only 2 percent of the 689,655 shares sold to the ESOP. In terms of dollar amounts, the directors' purchases totaled $ 191,023 -- a nominal amount when compared *148 to the $ 10 million expended by the ESOP. In Capital City Excavating Co. v. Commissioner, supra, on the other hand, the directors purchased nearly 10 percent of the number of shares purchased by the ESOP, and the transactions were on a much smaller scale. In Capital City Excavating Co., the directors purchased a total of 97 shares for $ 100 per share, while the ESOP acquired 1,000 shares and expended only $ 100,000. Actual sales must be made at arm's length in the normal course of business to establish fair market value. See Duncan Indus., Inc. v. Commissioner, supra at 276; Hooker Indus., Inc. v. Commissioner, supra. The unusual circumstances surrounding the directors' purchases in this case, which were not present in Capital City Excavating Co., raise questions about whether these transactions were at arm's length. The directors' investments in CTS stock were accomplished by informal, unsecured, interest-free bridge loans made by petitioner. Such favorable financing would not be available in an arm's-length transaction in the normal course of business. Actual *149 sales cannot be determinative of fair market value in the face of evidence to the contrary. See Duncan Indus., Inc. v. Commissioner, supra at 278. In the present case, there are objective factors, which were not present in Capital City Excavating Co., indicating that the fair market value of the stock was less than $ 14.50 per share. Petitioner and the underwriters attempted to market the proposed IPO during October and November 1986. The plan for the proposed IPO was to market 2,200,000 shares within a $ 13 to $ 16 price range. This effort failed. The "circle of interest" for CTS stock at this price range was determined by Pru-Bache and Raffensperger to be about $ 1 million or less. It follows that during October and November 1986, $ 10 million worth of CTS stock (the amount sold to the ESOP) could not have been sold to investors in the public market for $ 14.50 per share, and there was no evidence that circumstances improved by the time of the ESOP transaction in December 1986. Petitioner argues that the fair market value test contemplates a purely hypothetical buyer, and the public market provides only one category of potential buyers. *150 Petitioner points out that other markets, such as a merger, acquisition, or private placement, might support a $ 14.50 price. However, there was no evidence of any other potential buyers at $ 14.50 per share at the time of the ESOP transaction. "The hypothetical sale should not be constructed in a vacuum isolated from the actual facts that affect the value of the stock". Estate of Andrews v. Commissioner, 79 T.C. 938, 956 (1982). As of September 30, 1986, even CTS did not value its stock at $ 14.50 per share. CTS had previously entered into a conditional purchase agreement with Mr. Strakis, the minority shareholder, in August 1986, to buy his stock at the same price as the proposed public offering, then thought to be $ 14.25 per share. In CTS's consolidated balance sheet as of September 30, 1986, CTS valued this conditional obligation to repurchase Mr. Strakis' 33,876 shares at $ 406,500, the equivalent of $ 12 per share. Other Factors
Other criteria often considered in determining fair market value also suggest that the value of CTS stock on the date of the ESOP transaction was not $ 14.50 per share. The Commissioner, in Rev. Rul. 59-60, 1959-1 C.B. 237, 238-239, *151 sets out several factors to consider in determining fair market value: (a) The nature of the business and the history of the enterprise from its inception. (b) The economic outlook in general and the condition and outlook of the specific industry in particular. (c) The book value of the stock and the financial condition of the business. (d) The earning capacity of the company. (e) The dividend-paying capacity. (f) Whether or not the enterprise has goodwill or other intangible value. (g) Sales of stock and the size of the block of stock to be valued. (h) The market price of stocks of corporations engaged in the same or a similar line of business having their stocks actively traded in a free and open market, either on an exchange or over-the-counter.
See also Estate of Newhouse v. Commissioner, 94 T.C. at 217-218. Respondent points to the general economic outlook, the financial condition of CTS, and CTS's earning capacity as the significant factors to consider in the present case. With regard to the general economic outlook, there was an economic downturn in the public market after CTS filed its preliminary prospectus. Swings in the *152 IPO market relate to activity in the overall market or in a particular industry. It is undisputed that the IPO market took a turn for the worse; Mr. Tanner described the overall market atmosphere as "pretty lousy generally." Such an economic downturn tends to depress the fair market value of specific shares of stock. See Rev. Rul. 59-60, 1959-1 C.B. at 238. The financial condition and earning capacity of CTS were affected by the ESOP transaction. Upon formation of the ESOP, CTS undertook two obligations that affected both its balance sheet and its future operating income. First, CTS guaranteed the $ 10 million bank loan to the ESOP. The ESOP loan was required to be classified as a debt on CTS's balance sheet and a charge to shareholders equity. As of June 30, 1986, CTS's total assets exceeded its total liabilities by only $ 5,971,702. Thus, for accounting purposes, the loan guarantee had a significant impact on CTS's balance sheet net worth. Second, CTS obligated itself to make contributions to the ESOP in an amount sufficient to cover the loan payments, or at least $ 2 million per year. While the funding requirements would be tax *153 deductible, there would still be a significant negative effect on CTS's cash flow. Moreover, CTS was subject to certain restrictive covenants as a result of the loan agreement with the Bank. Such binding restrictions have been held to reduce the value of a company's stock. Estate of O'Connell v. Commissioner, 640 F.2d 249 (9th Cir. 1981), affg. in part and revg. and remanding in part T.C. Memo. 1978-191. In April 1986, the Government changed the method by which guaranteed student loans were to be disbursed by lenders, which was expected to cause a permanent reduction in available cash of approximately $ 5 million. This, combined with the obligations that CTS assumed in connection with the ESOP, would have a negative effect on CTS's cash flow. This would certainly have been considered by a potential buyer of CTS stock, thus affecting its value. See Donovan v. Cunningham, 716 F.2d at 1471. Finally, CTS was under investigation by the attorney general of California and the Inspector General of the U.S. Department of Education for possible violations of law in the company's operations. These *154 investigations were disclosed in the preliminary prospectus, where it was noted that "If any of these proceedings is concluded on an adverse basis to the Company, the Company could be severely and adversely affected." Marketability Discount
Respondent argues that because the Pru-Bache price range assumed a public market, the $ 14.50 price failed to take into account a discount for lack of marketability. A marketability discount reflects the hypothetical buyer's concern that there will not be a ready market when that buyer decides to sell the stock. Estate of Andrews v. Commissioner, 79 T.C. at 953. The failure of a public offering has been found to warrant a marketability discount. Estate of O'Connell v. Commissioner, T.C. Memo. 1978-191, affd. in part, revd. and remanded on other grounds 640 F.2d 249 (9th Cir. 1981). Such a discount may also take into account the risk of a closely held business whose operation depends on the special abilities of the dominant shareholder; i.e., a one-man business. Id.. Widely varying marketability discounts have been applied to the stock of *155 closely held corporations. See Estate of Jung v. Commissioner, 101 T.C. 412, 435 (1993); Pratt, Valuing a Business 148-155 (1981). It is undisputed that CTS's proposed IPO could not be accomplished in 1986. Although CTS anticipated marketing the IPO in the future, a potential buyer would still consider the risk that a future IPO would fail or be abandoned. In addition, the preliminary prospectus acknowledged that the future success of CTS may depend on petitioner's continued participation. [15]
Petitioner argues that a marketability discount is inappropriate because of the existence of a put option in the ESOP agreement. While the existence of a put option may preclude the need for a marketability discount, that is not the case here. See Reich v. Valley Natl. Bank, 837 F. Supp. 1259, 1283-1284 (S.D.N.Y. 1993); *156 Foltz v. U.S. News & World Report, Inc., 663 F. Supp. 1494, 1533-1534 (D.D.C. 1987), affd. 865 F.2d 364 (D.C. Cir. 1989); Pratt, supra at 341. A put option is generally defined as an option under which the buyer "may demand payment by the writer of a fixed price (the 'striking' price) upon delivery by the buyer of a specified number of shares of stock." Black's Law Dictionary 1237 (6th ed. 1990). For purposes of determining a marketability discount, the terms of the put option must be examined to determine how favorable they are. For example, the shorter the payout period and the higher the interest rate, the lower the appropriate marketability discount. Pratt, supra at 342. After examining the terms of the "put option" in CTS's ESOP agreement, we find that a marketability discount is still appropriate. CTS's ESOP agreement provides in pertinent part: Section 7.09 Option to Sell Employee Stock. * * * The option to sell shall: * * * (3) Specify that the sales price for any shares sold hereunder shall be the fair market value of such shares determined as of: (a) The date the Participant exercises *157 the option if such Participant is a "Disqualified Person" as defined at Section 4975(e)(2) of the Code or "Party-in-Interest" as defined in Section 408(e) of the ERISA; or (b) The most recent preceding Anniversary Date [16] if the Participant is not such a Disqualified Person or Party-in-Interest. (4) Specify that the sales price for any shares sold hereunder shall be paid in cash, or at the discretion of the purchaser, in substantially equal annual payments beginning no later than sixty (60) days after the date that put option is exercised and ending no later than five (5) years after that date * * *. If the payment of the sales price for the shares is deferred as provided for herein, then the purchaser must execute a promissory note for the amount of the deferred payment, which note shall provide for a reasonable rate of interest * * * [Emphasis added.]
First, this "put option" does not meet the definition of a true *158 put option, as it provides no fixed (or striking) price. The terms of the agreement provide simply that a participant may sell back his stock at fair market value at the determination date. Obviously, the fair market value of the stock on a future determination date might be far less than the price paid by the ESOP. Any such fair market value determination would presumably seek the price at which the property would change hands between a hypothetical willing buyer and a hypothetical willing seller, and it would include appropriate discounts, including a marketability discount. Second, the payout period may extend up to 5 years at an undetermined "reasonable rate of interest". Accordingly, we cannot find that the terms of the so-called put option eliminate the propriety of a marketability discount. Based on the foregoing, we find that petitioner has failed to meet his burden of proving that the fair market value of CTS stock was at least $ 14.50 per share. B. Good Faith Determination of Price
Even though petitioner has failed to prove that the fair market value of shares purchased by the ESOP was at least $ 14.50 per share, petitioner can still prevail if he proves that *159 the value was determined "in good faith" within the meaning of 29 U.S.C. sec. 1002(18)(B). That section defines adequate consideration as "the fair market value of the asset as determined in good faith by the trustee or named fiduciary". 29 U.S.C. sec. 1002(18)(B). Respondent contends that only those persons appointed to the plan committee during the December 12, 1986, board meeting fall within the definition of a "named fiduciary". Because petitioner has focused on the CTS directors' conduct and has introduced no evidence that the plan committee exercised good faith in determining a price, respondent argues that petitioner has failed to meet his burden of proving that the good faith requirement was met. Petitioner, on the other hand, argues that CTS, acting through its board of directors, falls within the definition of a named fiduciary. A named fiduciary is "a fiduciary who is named in the plan instrument, or who, pursuant to a procedure specified in the plan, is identified as a fiduciary (A) by a person who is an employer or employee organization with respect to the plan or (B) by such an employer and *160 such an employee organization acting jointly." 29 U.S.C. sec. 1102(a)(2). A person is a fiduciary if "he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets". 29 U.S.C. sec. 1002(21)(A)(i). Mr. Bruno, as the plan trustee, and the members appointed to the plan committee at the December 12, 1986, board meeting clearly fall within the definition of a named fiduciary. To the extent that we focus on the conduct of these fiduciaries in setting the price for CTS stock, we agree with respondent that petitioner failed to meet his burden of proving that these fiduciaries exercised good faith. There is no evidence that these individuals played any part in establishing the ESOP, let alone in setting the price for the stock. Two individuals, petitioner and Mr. Hahn, were both CTS directors and plan committee members. The evidence is clear that petitioner took no part in setting the stock price. While Mr. Hahn was present at the December 12, 1986, board meeting, we believe that he *161 was acting in his capacity as a director rather than as a plan committee member. As such, we will analyze his actions along with the actions of the rest of the CTS directors below. Next, we must determine whether CTS, acting through its board of directors, falls within the definition of a named fiduciary. A corporation may be a "person" for purposes of ERISA and, thus, may constitute a fiduciary. 29 U.S.C. sec. 1002(9), (21)(A). A corporation may also be designated a named fiduciary. Sec. 2509.75-5, at FR-3, Department of Labor Regs., 40 Fed. Reg. 31599 (July 28, 1975), redesignated at 41 Fed. Reg. 1906 (Jan. 13, 1976). A corporation necessarily must exercise its discretionary authority as a fiduciary through its officers, directors, and other agents. However, the corporate agents do not become fiduciaries merely by reason of their positions. In order for such individuals to become fiduciaries, it must be shown that they have individual discretionary roles as to plan administration. Confer v. Custom Engg. Co., 952 F.2d 34, 37 (3d Cir. 1991); sec. 2509.75-8, *162 at D-4, D-5, Department of Labor Regs., 40 Fed. Reg. 47491 (Oct. 9, 1975), redesignated at 41 Fed. Reg. 1906 (Jan. 13, 1976). CTS qualifies as a fiduciary, because under the terms of the CTS ESOP plan, CTS was to exercise discretionary authority or control respecting management of the plan. CTS was the administrator of the plan and was to oversee the plan committee in the performance of its duties (and to act as the plan committee if none were appointed). CTS also had the power to amend the plan, including redesignating the members of the plan committee. As such, CTS falls within the definition of a fiduciary. Furthermore, CTS was expressly designated as a named fiduciary in the plan instrument. Because CTS acted through its board of directors in establishing the ESOP, we must analyze the directors' actions in determining whether CTS exercised good faith in determining the price of the CTS stock purchased by the ESOP. The good faith requirement is interpreted so as to give effect to the general duties of fiduciaries set out in section 404 of ERISA. Donovan v. Cunningham, 716 F.2d at 1467. *163 Section 404 of ERISA provides in pertinent part: (a)(1) * * * a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and -- * * * (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; [29 U.S.C. sec. 1104(a)(1)(B).]
Prudence is measured according to the objective "prudent person" standard developed in the common law of trusts. Katsaros v. Cody, 744 F.2d 270, 279 (2d Cir. 1984); Donovan v. Mazzola, 716 F.2d 1226, 1231 (9th Cir. 1983). In fact, Congress made the duties imposed on ERISA fiduciaries even more exacting than those imposed on common law trustees. Donovan v. Mazzola, supra at 1231; Reich v. Valley Natl. Bank, 837 F. Supp. at 1273. In applying the prudent person test, a court must consider "'whether the individual trustees, at the time *164 they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment.'" Katsaros v. Cody, supra at 279 (quoting Donovan v. Mazzola, supra at 1232). This analysis focuses on the conduct of the fiduciaries, not the success or failure of the investment. Donovan v. Cunningham, supra at 1467; Donovan v. Walton, 609 F. Supp. 1221, 1228 (S.D. Fla. 1985), affd. sub nom. Brock v. Walton, 794 F.2d 586 (11th Cir. 1986). The law is well settled that ERISA fiduciaries need not themselves possess experience or expertise in appraisal or other facets of plan administration; a fiduciary may rely on the advice of experts or other professionals. Donovan v. Mazzola, supra at 1234; Foltz v. U.S. News & World Report, Inc., 663 F. Supp. at 1536. In fact, the fiduciary has a duty to seek outside assistance where he lacks the requisite education, experience, and skill to evaluate the *165 decision. Katsaros v. Cody, supra at 279; Reich v. Valley Natl. Bank, supra at 1274; Whitfield v. Cohen, 682 F. Supp. 188, 194 (S.D.N.Y. 1988). The fiduciary may not, however, blindly rely on such expert advice; he must make his own decision in light of the advice he receives. Donovan v. Mazzola, supra; Reich v. Valley Natl. Bank, supra; Whitfield v. Cohen, supra.
In interpreting the duties of fiduciaries under ERISA, the court must balance the congressional concerns underlying the statute: to encourage competent fiduciaries to serve without giving unscrupulous ones a license to steal. Donovan v. Cunningham, supra at 1466; Donovan v. Walton, supra at 1231. Congress has clearly stated the legislative concerns and policies underlying ERISA, which follow in pertinent part: (a) * * * The Congress finds * * * that the continued well-being and security of millions of employees and their dependents are directly *166 affected by [employee benefit] plans * * * (b) * * * It is hereby declared to be the policy of this Act to protect * * * the interests of participants in employee benefit plans and their beneficiaries * * * by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans * * * [29 U.S.C. sec. 1001.]
We find that the board's actions in the present case did not rise to the exacting level of prudence imposed on ERISA fiduciaries. The board had before it a letter from Pru-Bache, an independent investment banking firm, that was 2 months old. That letter set forth Pru-Bache's estimation of a range of value for CTS stock, for purposes of the proposed IPO, of $ 13 to $ 16 per share, the midpoint being $ 14.50 per share. The most important factor that should have alerted the board to question its continued reliance on the Pru-Bache estimated price range was the fact that, in reality, the IPO could not be successfully carried out using the $ 13 to $ 16 price range. The board members knew that the market would not support the proposed offering in that price range and that, as a result, the proposed IPO *167 was shelved. The fact that the market itself had changed after Pru-Bache conducted its analysis for purposes of the proposed IPO should have alerted the board that circumstances affecting the market value of CTS stock had changed. The Pru-Bache estimated price range for the proposed IPO was based on the assumption of certain facts and circumstances that the board knew were no longer present in December 1986. These assumptions included: (1) The receipt by CTS of millions of dollars in cash as a result of the IPO; and (2) the absence of the ESOP and the attendant $ 10 million debt and contribution requirements. These factors had a significant impact on the financial condition of CTS that should have been taken into account by a fiduciary. See Donovan v. Cunningham, 716 F.2d at 1471. There is no evidence that the CTS board specifically considered the effect of any of these intervening factors. A fiduciary's obligations restrict him from relying on a financial or legal opinion without understanding the basis for the recommendations contained in the opinion. Reich v. Valley Natl. Bank, 837 F. Supp. at 1275. To the extent *168 that the CTS board members relied on Mr. Perry, they appear to have done so without independently evaluating the merits of his opinion in order to come to their own decisions. The CTS board approved the ESOP plan the same day it was presented to them. With respect to Mr. Perry's statement to the directors, the minutes from the December 12, 1986, board meeting simply state: Mr. Perry indicated that he thought the valuation placed on the company by Prudential-Bache was very reasonable and if it were he, he would not sell his stock for anything less. Different members of the Board asked questions concerning the valuation and what the employees might be able to expect for their stock if it were to be sold in the future. Mr. Perry indicated it is impossible to predict what the price of stock would be in the future, but he again reiterated that he felt that the market price of $ 14.50 being paid was fair and equitable to both sides.
There is no evidence as to what specific factors Mr. Perry considered in arriving at the $ 14.50 price, or what questions Mr. Perry answered at the meeting. It is, therefore, impossible to determine whether Mr. Perry exercised prudence or whether *169 the other directors understood the basis for Mr. Perry's opinion. Although Mr. Perry had a favorable reputation as a businessman in the areas of public finance and business valuations, the above is simply not sufficient to meet petitioner's burden of proving that the board members "'employed the appropriate methods to investigate the merits of the investment'", Katsaros v. Cody, 744 F.2d at 279 (quoting Donovan v. Mazzola, 716 F.2d at 1232), or that they exercised their own judgment with regard to the ESOP transaction.[17]
Petitioner argues that the CTS board members also relied on the opinion of the law firm that represented CTS both in the proposed IPO and in the ESOP transaction that the ESOP transaction was not prohibited under ERISA or the Internal Revenue Code. There is no evidence that the law firm performed a valuation analysis or that *170 the law firm purported to possess any expertise in valuing stock. Moreover, there is no indication that the fiduciaries understood the basis for the opinion. Reich v. Valley Natl. Bank, supra at 1275. In any event, reliance on counsel's advice is, at most, a single factor to be weighted in determining whether a fiduciary has breached his or her duty. Donovan v. Mazzola, supra at 1234. Petitioner claims that there were other factors within the knowledge of the CTS board members upon which they relied in determining a price. As an example, petitioner points to informal opinions of various investment banking firms in 1985 that the value of CTS ranged from $ 50 million to $ 120 million. However, the fact that the range of values was so expansive seems to support an argument that the board should have been alerted to question the true value of the company. Moreover, the CTS board members knew: (1) The IPO could not be successfully carried out at a $ 13 to $ 16 price range; (2) the Internal Revenue Service might scrutinize reliance on the Pru-Bache estimated price range; [18] (3) CTS was under investigation by *171 the attorney general of California and the U.S. Department of Labor; and (4) CTS would have to guarantee a $ 10 million loan in connection with the ESOP, and, as a result, CTS would be subject to various restrictions, including limitations on its ability to borrow money. Knowledge of such factors would also place upon the fiduciaries a greater duty to investigate. It is questionable whether the board had sufficient time to independently evaluate the fair market value of the stock purchased by the ESOP. Petitioner and the underwriters were still attempting to market the IPO as late as the first week in November 1986. Petitioner wanted to sell a portion of his stock before the end of the year, because he wanted to take advantage of favorable tax rates for capital gains that would not be available after the end of 1986. When the IPO *172 was finally shelved, the alternative was to form the ESOP, arrange financing, and have the ESOP purchase petitioner's stock. Time was scarce, and the directors were aware of this time constraint. The present case is remarkably similar to Donovan v. Cunningham, 716 F.2d 1455 (5th Cir. 1983). In that case, the Secretary of Labor alleged that the members of the administrative committee of the ESOP had breached their fiduciary duties to the ESOP in connection with two transactions whereby the ESOP acquired stock of the employer from Mr. Cunningham, who was the chairman of the board, chief executive officer, and sole shareholder of the employer as well as a member of the administrative committee of the ESOP. Id. at 1459. In the first transaction, the defendants, in their capacity as the board of directors, voted to contribute $ 288,000 in cash to the ESOP for the purpose of acquiring stock for $ 200 per share from Mr. Cunningham. In the second transaction, 6 months later, the defendants, in their capacity as the administrative committee, voted to purchase additional shares from Mr. Cunningham at $ 200 per share, for a *173 total price of $ 1 million. To fund this purchase, the administrative committee caused the ESOP to borrow $ 1 million from a bank. Pursuant to the loan agreement, the employer was obligated to make sufficient yearly ESOP contributions to amortize the loan. Id. at 1459-1460. In determining the price at which the ESOP would purchase the shares, the fiduciaries relied upon a prior independent appraisal by an investment banking firm, which was updated by the fiduciaries' personal assessments of the company's financial prospects based upon their knowledge as company insiders. Id. at 1468. The appraisal had been performed before the ESOP transactions and, thus, did not assume the establishment of an ESOP. Id. at 1469, 1471. The appraisal was based in part upon revenue and income projections prepared by the company's management, and it assumed a constant growth rate. However, due to the failure of certain foreseen contracts to materialize, the actual revenues and growth rate were considerably less than the projections. Id. at 1469-1470. The Court of Appeals *174 for the Fifth Circuit, reversing the District Court, held that although the administrative committee members exercised subjective good faith, they nonetheless breached their fiduciary duties (an objective standard) by failing to conduct an investigation sufficient to determine whether the independent appraisal remained a reasonable approximation of the fair market value of the stock at the times they relied on it. The court noted that two critical assumptions made by the appraiser -- the growth projections and the absence of an ESOP -- were no longer valid. Id. at 1473. The court also noted that while the fiduciaries were entitled to consider information available to them by virtue of their management positions, such knowledge, in itself, does not constitute an investigation sufficient to warrant continued reliance on the appraisal, especially in light of the fact that the fiduciaries' views had previously proved to be overly optimistic. Id. at 1469, 1470. Similarly, in the present case, it was not enough for the fiduciaries to rely on their generalized beliefs that CTS's prospects were good. The Pru-Bache estimated *175 price range represented an analysis of specific facts and assumptions. Prudent fiduciaries would have sought to analyze the effect of obvious changes in those facts and assumptions; namely, the failure of the IPO to materialize and the establishment of an ESOP. There is no evidence that the CTS board considered the impact of these changes on the value of CTS stock. In light of the foregoing, we find that petitioner has failed to meet his burden of proving that the ESOP fiduciaries exercised prudence in determining the price of the stock. We hold that petitioner is liable for the excise tax under section 4975. While the results are harsh, it is clear that Congress intended severe consequences for failure to comply with the standards applicable to such transactions. The policy behind ERISA is to protect the interests of participants in employee benefit plans and their beneficiaries. 29 U.S.C. sec. 1001(b). This requires the exercise of prudence when investing the money of others. Decision will be entered for respondent with regard to the deficiencies. [19]
*176 Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. On brief, respondent abandoned her position that the additions to tax were applicable.↩
3. At trial, respondent's Exhibit X was admitted over petitioner's objection. Petitioner was invited to address the issue on brief. Upon reconsideration, we sustain petitioner's objection.↩
1. Financial data not available.↩
4. Because CTS did not proceed with the IPO by Dec. 31, 1986, as discussed infra↩, the promissory note to Mr. Strakis was canceled, and he was issued 33,875 shares of CTS stock as agreed.
5. The relevant portion of the Manatt, Phelps letter states: The transactions contemplated by the Loan Agreement, the Note and the Stock Agreement do not constitute a non-exempt 'prohibited transaction' under the [Internal Revenue] Code [of 1986] or the Employment Retirement Income Security Act of 1974, as amended ('ERISA') or violates [sic] any other provision of the Code of [sic] ERISA.↩
The letter does not contain any specific opinion or reference to whether the ESOP's purchase of CTS stock was for "adequate consideration" or whether the purchase price of $ 14.50 per share constituted fair market value.
6. The establishment of the ESOP under these terms will be referred to throughout the remainder of this opinion as "the ESOP transaction".↩
7. See Consolidated Omnibus Budget Reconciliation Act of 1985, Pub. L. 99-272, 100 Stat. 82.↩
8. Sec. 4975(f)(4) provides: Amount involved. -- The term "amount involved" means, with respect to a prohibited transaction, the greater of the amount of money and the fair market value of the other property given or the amount of money and the fair market value of the other property received * * * For purposes of the preceding sentence, the fair market value -- (A) in the case of the tax imposed by subsection (a), shall be determined as of the date on which the prohibited transaction occurs; and (B) in the case of the tax imposed by subsection (b), shall be the highest fair market value during the taxable period.↩
9. The "taxable period" in this case ended on the date of mailing the notice of deficiency. See sec. 4975(f)(2). ↩
10. A party in interest includes an owner, direct or indirect, of 50 percent or more of the stock of a corporation whose employees are covered by the plan. 29 U.S.C. sec. 1002(14)(E), (C)↩.
11. ERISA sec. 408(e) further requires that no commission be charged and that the plan be an eligible individual account plan, as defined in sec. 407(d)(3). 29 U.S.C. sec. 1108(e)(2), (3)(A)↩. As respondent has stipulated that petitioner has met these requirements, our analysis is limited to the requirement of adequate consideration.
12. The Secretary of Labor subsequently published sec. 2510.3-18, Proposed Department of Labor Regs., 53 Fed. Reg. 17637 (May 17, 1988), defining adequate consideration. These proposed regulations set out a two-part test for adequate consideration: (1) The price reflects fair market value, and (2) the price was the result of a determination made in good faith. Id.↩ sec. 2510.3-18(b)(1)(ii). However, this definition is not binding for purposes of this case.
13. It is undisputed that CTS would have received an infusion of cash as a result of the IPO. Although petitioner and respondent differ in their estimations of how much cash CTS would have received as a result of the IPO, petitioner admits that CTS would have received between $ 7,200,000 and $ 9 million had the IPO gone forward. Although the cash influx might not have increased the value of CTS on a dollar-for-dollar basis, it probably would have had a positive effect on CTS's value. Moreover, the influx of cash from an IPO is one factor that was considered by the underwriter in establishing the offering price.↩
14. CTS guaranteed the $ 10 million bank loan to the ESOP. The ESOP loan was required to be classified as a liability on CTS's balance sheet. Furthermore, CTS entered an agreement with Mr. Bruno as trustee of the ESOP, whereby CTS obligated itself to make minimum contributions to the ESOP in an amount equal to the loan principal and interest thereon. These minimum contributions would be at least $ 2 million per year, which represents only the repayment of the loan principal under the terms of the loan agreement.↩
15. Specifically, the preliminary prospectus stated: "No assurance can be given that the Company's business would not be adversely affected if, for any reason, Mr. Eyler ceased to be active in the Company's management."↩
16. "'Anniversary Date↩' means the last day of the Plan Year, which is June 30."
17. One of the CTS directors testified that, at the time of the board meeting, he did not know what an ESOP was.↩
18. Mr. Perry specifically informed the board during the Dec. 12, 1986, board meeting that the Internal Revenue Service might challenge their reliance on the Pru-Bache estimated price.↩
19. See supra↩ note 2.